[Cite as *State v. George*, 2024-Ohio-471.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

      Plaintiff- Appellee,           :

                              No. 112380

v.                                       :

MILTON GEORGE, IV,                       :

      Defendant-Appellant.           :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** February 8, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-667743-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jonathan Block, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Rick Ferrara, Assistant Public Defender, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant, Milton George, IV, was convicted after a jury trial of several sex offenses, including forcible rape under R.C. 2907.02(A)(2) and gross sexual imposition ("GSI") under R.C. 2907.05(A)(1), for engaging in sexual

conduct and sexual contact, respectively, with 18-year-old M.B., his ex-wife's daughter, who considered George her stepfather. Both offenses require the state to produce evidence that the defendant purposely compelled the other person to submit "by force or threat of force."

{¶ 2} At trial, it was undisputed that George engaged in sexual activities with M.B. while she stayed at his residence. The issue at trial was whether the state proved the element of force to sustain convictions for rape and gross sexual imposition. While M.B.'s testimony may have indicated some degree of physical force was used by George, the trial court instructed the jury that the element of force could also be proven by evidence that the victim's will was overcome by fear or duress alone.

{¶ 3} As we explain, the jury instruction was given in error under the circumstances of this case. The state claims the alternative definition of force applies because George is the victim's stepfather, but the alternative definition is not applicable to an adult child pursuant to precedent from the Supreme Court of Ohio. In this case, the victim had reached the age of majority at the time the activity underlying the indictments occurred. The erroneous jury instruction was prejudicial and deprived of the defendant a fair trial because it allowed the jury to convict George with less evidence for force, an essential element of rape, especially where the victim's testimony was equivocal on the issue. Guided by the precedent from the Supreme Court of Ohio, we are compelled to reverse George's conviction of rape and GSI and remand the case for a new trial.

{¶ 4} George was also convicted of sexual battery under R.C. 2907.03(A)(5), Ohio's incest statute. Because the stepfather-stepchild relationship had dissolved due to George's divorce from M.B.'s mother prior to the acts at issue, we are also constrained to reverse the sexual battery conviction as the state presented legally insufficient evidence to satisfy the elements of that offense.

**M.B.'s and George's Testimony Regarding Their Relationship**

{¶ 5} The central issue in this case concerns force. As we explain in the following, a parent, stepparent, or a person in loco parentis can be convicted of rape of a child without evidence of explicit threat or display of force. We therefore begin our analysis with a review of M.B.'s testimony regarding her relationship with George. M.B., who was 18 at the time of the incident (and 19 at the time of the trial), testified that George, age 37, was her stepfather. George and her mother met when she was six months old. They had two children, whom M.B. referred to as her siblings. George and her mother divorced when M.B. was seven years old. After the divorce, M.B. lived with her mother and siblings. George moved to Texas and was not involved in her life for six years. When he returned to Cleveland, she would see him only when he came to her mother's house to pick up her siblings for visitation. Despite a lack of frequent contact, she still called him "dad." She testified that "[w]e didn't really have a relationship because he wasn't my dad," but she also testified that "I always see him as a stepfather."

{¶ 6} M.B. testified that George "treated me like he aways treated me as a kid. He never treated me differently." She also testified that George was a father figure

to her, although she acknowledged he was not active in her life and did not do anything for her after George and her mother parted ways. M.B. consistently referred to George as her stepfather, even when interviewed by the SANE nurse and the police after the incident.

{¶ 7} M.B. further testified that after her mother passed away in 2021, she lived with her own father while her siblings lived with George. However, her father did not approve of her sexual orientation and, in February 2022, she was mostly staying with her siblings' grandmother (George's mother). Around that time, George had just moved to a new house down the street from his mother's house. Her sister (George's daughter) asked her to come over to see the new house. At that time, M.B. was staying at her girlfriend S.M.'s home and had an argument with S.M., so she left S.M.'s home and went to stay at George's house, where her siblings were staying at the time. M.B. stayed at George's house for two or three days and slept on an air mattress at night in George's dining room before the incident occurred.

{¶ 8} George also testified at trial. Regarding his relationship with M.B., he testified that he was 19 when he started a relationship with M.B.'s mother. They were married for 10 years and divorced in 2011. He moved to Texas in 2014 and lived there for six years. He had no contact with M.B. when he was in Texas. After he returned to Cleveland at the end of 2019, he saw M.B. only in passing when he picked up or dropped off his children with M.B.'s mother; since 2011, he saw her on less than ten occasions.

**Testimony Regarding the Incident**

{¶ 9} Regarding the incident, M.B. testified that on that night of the incident, George had been to a karaoke bar and drinking. When he came home around 5 a.m., she was lying on the air mattress in the dining room and watching a movie on Netflix. He sat down next to her, talking about her mother and also asking her questions about her girlfriend and her sexual orientation. He asked her if she ever had a relationship with a man. She answered no. He responded that just because she liked something did not mean it was the right thing to do. He then suddenly touched her breasts over her pajamas, and she was "in shock."

{¶ 10} M.B. testified that "I could have pushed him off me, but I didn't. That's my fault. But I kind of scooted over just a little bit." George then asked her to sit on his lap. She was hesitant, but he grabbed her arm, stood her up, and sat her on his lap. She "went into panic mode" and got so scared that she urinated on herself. The urine ran down her leg and under her pajamas. As a result, she asked to take a shower. George told her to use the bathroom in the basement so as not to wake up her siblings. She testified as follows regarding what occurred in the shower in the basement:

> I didn't know how to work the shower fully. So I turned it on, but it wasn't the right temperature, so I just stood there with my clothes on. And he brought me a towel downstairs. * * * He asked me why my clothes were still on. * * * [I said] [b]ecause I didn't see any soap. * * * He gets me the soap and the rag, and he fixed the shower for me. At this point he doesn't have his clothes on. * * * I was in shock that someone that I call my dad wanted to have sexual intercourse with me. * * * He fixed the water temperature. * * * I took my clothes off, and I got into the shower, and then he proceeded to get in the shower

with me. * * * He took the rag and put the soap on it and washed me up. * * *

{¶ 11} M.B. further testified that, while George was washing her, he touched her breasts with his mouth and touched her vagina with both his hands and his mouth. Because she was scared, she did not say anything or tell him to stop. She testified she was sniffling the entire time. George asked her several times if she was crying. She answered "no" because she was scared.

{¶ 12} M.B. testified that after George washed her, he "bent her over" the toilet, which was adjacent to the shower, while her feet were still in the shower. He proceeded to have vaginal intercourse with her. She did not say no but continued to sniffle. He asked her several times if she was crying, and although she kept answering no, he eventually realized she was crying and stopped.

{¶ 13} M.B. then put her clothes on and went upstairs. She quickly got in touch with her girlfriend, S.M., by Facetime and, for fear of being heard by George, typed out what happened on the phone screen. She let both S.M. and S.M.'s mother know what occurred and asked to be picked up. She then packed her belongings, quietly opened the door, and ran down the driveway.

{¶ 14} M.B. also called her stepmother about the incident. Her stepmother told her to tell her father, who told her to call the police and go to a hospital. S.M. and her brother then picked her up at a nearby gas station. M.B. called the police on the way to the hospital — her 911 called was played for the jury. She received a rape kit at the hospital and was examined by a SANE nurse.

{¶ 15} On cross-examination, M.B. acknowledged that she never once voiced her fear or said no during the incident, she did not try to get out of the shower when he got in, and he did not hold her down. She also acknowledged he did not force her to do anything throughout the incident or threaten her in any way. She specifically testified that "[t]here was no force" in the following exchanges:

> [DEFENSE COUNSEL]: * * * But at no point * * * he ever forced you to do anything. He didn't * * * lead you down to the stairs to the shower? He didn't force you down the stairs and say, I am taking you downstairs to the shower and I am going to have sex with you?
>
> [M.B.]: That's correct.
>
> [DEFENSE COUNSEL]: He never did that?
>
> [M.B.]: No.
>
> [DEFENSE COUNSEL]: Did he ever threaten you in any way? Did he say, you better get down there right now?
>
> [M.B.]: No.
>
> * * *
>
> [DEFENSE COUNSEL]: Again, you said in the shower he was back towards the [shower] handles. He never pulled you in and made you stay in the shower. He never forced you into the shower at any point.
>
> [M.B.]: No. There was no force.
>
> [DEFENSE COUNSEL]: Okay. Thank you. Nothing further, Your Honor.

(Tr. 460).

{¶ 16} On redirect, M.B. testified that she did not initiate any sexual acts with George but she felt like she could not say no "[b]ecause [she] was scared."

{¶ 17} George testified that he thought the sexual activity was consensual. M.B. had come to stay at his house for a few days because she had an argument with her friend. On the night of the incident, he went out around midnight to go to a karaoke bar and had a few drinks. When he came home, M.B. was still up and watching T.V. He denied they talked about her sexual orientation. Rather, they talked for a few minutes about the show she was watching and, because the show was about sex, their conversation turned into a sexual nature and "before I knew, we [were] kissing." He also touched her breasts. After a few minutes, M.B. indicated she wanted to take a shower in the basement and they both went to the basement. M.B. asked for a towel and soap, and he got them for her and returned to the basement.

{¶ 18} George testified that "[b]y that time, she was undressed, and then I got undressed myself and then * * * turned the shower on, and we started kissing again * * *." He testified that they were "kissing * * *, touching, [and] rubbing * * *." He then took the towel and soap and washed her body and his own body, and they started to engage in sex. He answered affirmatively when asked if M.B. wanted him to go into the shower with her, if she wanted to have sex with him, and if she initiated some of the sexual conduct. He testified that she never told him to stop or pushed him off.

{¶ 19} George testified that the vaginal intercourse occurred in the shower and denied bending her over the toilet. He also denied touching her vagina with his mouth or fingers. After the sexual activity, they got dressed and went upstairs and

he went to sleep. His daughter woke him up and informed him that M.B. accused him of raping her. The police arrived shortly thereafter at his house.

{¶ 20} M.B.'s girlfriend S.M., S.M.'s brother, and S.M.'s mother also testified. S.M. testified M.B. was staying both at her house and at M.B.'s grandmother's house in February 2022. On February 9, 2022, she found out about the incident when she woke up. She and her brother picked up M.B. from a gas station and then she and her mother took M.B. to the emergency room. S.M.'s brother testified that S.M. woke him up that morning, frantic and screaming. At the time, S.M. was on a Facetime video call with M.B. and he saw that M.B. was in tears and looked distraught. When he approached the gas station, he saw M.B. running toward the gas station and crying uncontrollably. M.B. called 911 while in his vehicle. S.M.'s mother testified that she was awoken by her daughter, who was screaming about what happened to M.B. She spoke to M.B. on the phone and told her to leave the house quickly. She took M.B. to the emergency room and waited there until M.B.'s father and stepmother arrived at the emergency room.

{¶ 21} Sean Riley, Earl Pierson, and Michael Mathis of the city of Cleveland Heights police department testified about their involvement and investigation of the case. George was very cooperative and invited the officers in when the officers went to his house that morning, and he consented to a search of the house. The SANE nurse testified about her examination of M.B. and read a narrative provided by M.B. during the examination; the narrative is largely consistent with her testimony at

trial.  A DNA analyst testified that George's DNA was found on M.B.'s breasts and

buttocks.

**Jury Instruction**

{¶ 22} The trial court gave the following instruction pursuant to *State v.*

*Eskridge*, 38 Ohio St.3d 56, 58-59, 526 N.E.2d 304 (1988), regarding the element

of force:

> Force.  Force means any violence, compulsion or constraint physically exerted by any means upon or against a person or thing. Threat includes direct or indirect threat.
>
> Another definition [for force]: Force of a parent or other authority figure.  When the defendant, Milton George, is the parent, stepparent or person in loco parentis or other authority figure to [M.B.], the element of force need not be openly displayed or physically brutal.  It can be subtle, slight, and psychological or emotionally powerful.  Evidence of expressed threat or harm or evidence of significant physical restraint is not required.[1]
>
> If you find beyond a reasonable doubt that under the circumstances of this case the victim's will was overcome by fear or duress or intimidation, the element of force has been proved.
>
> In loco parentis means standing in the place of a parent and assuming parental duties or responsibilities.

{¶ 23} At the closing argument, the state emphasized that "there's two ways

that we're arguing force in this situation.  * * * Our second way is a force of a parent

---

[1] We note that the instruction on force applicable to an offender who is a parent or other authority figure is taken from the Ohio Jury Instruction on the element of force for the rape offense.  However, a comment on the alternative definition states that "this instruction does not apply to an adult victim, even in a parent-child relationship," citing *State v. Schaim*, 65 Ohio St.3d 51, 54-56, 600 N.E.2d 661 (1992), which we discuss in the following analysis.

or other authority figure." The state then read the *Eskridge* instruction verbatim. During rebuttal closing argument, the state again stressed that "[a]nother way of force is the force of a parent or authority figure" and "[s]he was scared. That's enough when you have that parent authority figure."

**Judgment and Appeal**

{¶ 24} The jury found George guilty of one count of rape in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 3); one count of sexual battery in violation of R.C. 2907.03(A)(5), a third-degree felony (Count 4); and two counts of GSI in violation of R.C. 2907.05(A)(1), a fourth-degree felony (Counts 7 and 8). Counts 3, 4, and 8 relate to the sexual conduct in the basement shower, and Count 7 relates to the sexual contact in the dining room.

{¶ 25} The trial court merged Count 4 into Count 3 for sentencing and imposed on Count 3 an indefinite prison term of six to nine years pursuant to the Reagan Tokes Law. The court also imposed 18 months each on Counts 7 and 8 and ordered them served concurrently.

{¶ 26} On appeal, George raises the following assignments of error:

I.   The trial court abused its discretion in giving jury instructions that lowered the state's burden of proof.

II.  The trial court committed plain error in issuing an *Eskridge* instruction and faulty sexual battery instruction.

III. Defendant received ineffective assistance of counsel for counsel's failure to demand correct jury instructions.

IV.  The state of Ohio presented insufficient evidence of rape, gross sexual imposition, and sexual battery.

V.     The manifest weight of the evidence did not support a conviction for rape, gross sexual imposition, or sexual battery.

VI.    The trial court erred in imposing an indefinite sentence as SB 201 is unconstitutional.

{¶ 27} We first discuss George's claims of insufficient evidence and erroneous jury instructions concerning his convictions of rape and GSI.  We review them jointly because they both concern the central issue of this case: whether the element of force in these offenses was proven.  We begin our analysis with the standard of review for claims of insufficient evidence and erroneous jury instruction.

**Standard of Review for Sufficiency of Evidence**

{¶ 28} George argues that the evidence presented at trial is insufficient for his convictions.  When reviewing a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*  A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

**Standard of Review for Claim Challenging Jury Instructions**

{¶ 29} George agues the trial court's *Eskridge* instruction regarding force is erroneous and prejudiced him. A trial court has broad discretion to determine whether the evidence presented at trial is sufficient to warrant a jury instruction. *State v. Torres*, 8th Dist. Cuyahoga No. 99596, 2013-Ohio-5030, ¶ 51, citing *State v. Mitts*, 81 Ohio St.3d 223, 228, 690 N.E.2d 522 (1998). However, "[w]hether jury instructions provide a correct statement of the law is a legal issue that an appellate court reviews de novo." *State v. Echevarria*, 8th Dist. Cuyahoga No. 105815, 2018-Ohio-1193, ¶ 27, citing *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 135.

{¶ 30} Moreover, "'[a] reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error.'" *State v. Shepherd*, 8th Dist. Cuyahoga No. 102951, 2016-Ohio-931, ¶ 25, quoting *State v. McKibbon*, 1st Dist. Hamilton No. C-010145, 2002-Ohio-2041, ¶ 27, citing *State v. Adams*, 62 Ohio St.2d 151, 154, 404 N.E.2d 144 (1980). An erroneous jury instruction constitutes prejudicial error where it results in a manifest miscarriage of justice. *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 55; *State v. Hancock*, 12th Dist. Warren No. CA2007-03-042, 2008-Ohio-5419, ¶ 13; and *McKibbon* at 4. When the trial court has given a prejudicial jury instruction, the appropriate remedy for the error is a new trial. *State v. Hurt*, 8th Dist. Cuyahoga No. 110732, 2022-Ohio-2039, ¶ 44,

citing *State v. Triplett*, 7th Dist. Mahoning No. 17 MA 0128, 2018-Ohio-5405, ¶ 17, citing *State v. Williford*, 49 Ohio St.3d 247, 253, 551 N.E.2d 1279 (1990).

**Force As Essential Element of Rape and GSI**

{¶ 31} George was convicted of rape as indicted in Count 3 for engaging in vaginal penetration with M.B. in violation of R.C. 2907.02(A)(2), which states "[n]o one shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." He was convicted of two counts of GSI as indicted in Counts 7 and 8 in violation of R.C. 2907.05(A)(1), which prohibits sexual contact when the offender "purposely compels the other person * * * to submit by force or threat of force." Count 7 relates to George's sexual contact with M.B. while in the dining room, and it charged George with GSI, "to wit: touched breasts"; Count 8 relates to his sexual contact with her while in the basement shower, and it charged him with GSI, "to wit: touched/kissed vagina."[2]

{¶ 32} Both the rape offense and the GSI offense required the state to produce evidence demonstrating force or threat of force. George admitted to having sexual contact with M.B. in the dining room and having both sexual contact and

---

[2]"Sexual conduct" is defined in R.C. 2907.01(A) as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body * * *into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." "Sexual contact" is defined in R.C. 2907.01(B) as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

sexual conduct with M.B. in the basement shower.  The central issue in this case is whether there was sufficient evidence of force to sustain George's convictions under Counts 3, 7, and 8.

**Definition of Force: *Eskridge* and Its Progeny**

{¶ 33} R.C. 2901.01(A)(1) defines "force" as any "violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." However, in cases involving sexual contact or conduct between a minor child and a parent or parental authority figure, the Supreme Court of Ohio has held that force can be subtle and psychological and thus be proven without a showing of physical force.

{¶ 34} In *Eskridge*, 38 Ohio St.3d 56, N.E.2d 304, the defendant was charged with raping his four-year-old daughter. The issue before the court in *Eskridge* was whether there was evidence presented at trial to prove whether the defendant used force or the threat of force in the commission of the crime.  The court held that

> [t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength.

*Id*. at paragraph one of the syllabus.  The court recognized "the coercion inherent in parental authority when a father sexually abuses his child." *Id*. at 59.  In this context, "[f]orce need not be overt and physically brutal, but can be subtle and psychological"

and the forcible element of rape can be established "[a]s long as it can be shown that the rape victim's will was overcome by fear or duress[.]" *Id.* at 58-59. The court concluded that the defendant father "held a position of authority over [the child] which did not require any explicit threats or displays of force." *Id.* at 59.

{¶ 35} In *State v. Dye*, 82 Ohio St.3d 323, 695 N.E.2d 763 (1998), the Supreme Court of Ohio applied *Eskridge* to a domestic situation where the offender was not the victim's parent but held a position of authority over a child due to his relationship with the child's mother. In that case, the defendant was not the 9-year-old child victim's parent but a close friend of the victim's mother who had placed the child in the defendant's care on numerous occasions. The court in *Dye* held that a person in a position of authority over a child under 13 may be convicted of rape of the child with force without evidence of express threat of harm or evidence of significant physical restraint. *Id.* at 329. *See also e.g., State v. Riffle*, 110 Ohio App.3d 554, 561, 674 N.E. 2d 1214 (9th Dist.1996) (applied *Eskridge* to a defendant who was not the natural parent of the child victim but held a position of authority over the young child by way of his live-in relationship with the child's mother). *Id.* at 561.

{¶ 36} However, the Supreme Court of Ohio declined to extend *Eskridge*'s holding to an *adult* victim who was a child of the offender. In *Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661, the 20-year-old victim admitted the defendant did not use physical force or the threat of physical force, nor did the state present any evidence of physical force. Therefore, the court affirmed the appellate court's reversal of the

conviction of rape. In doing so, the Ohio Supreme Court distinguished *Eskridge* based on the age of the victim. It reasoned that

> *State v. Eskridge* is based solely on the recognition of the amount of control that parents have over their children, particularly young children. Every detail of a child's life is controlled by a parent, and a four-year-old child knows that disobedience will be punished, whether by corporal punishment or an alternative form of discipline. Because of the child's dependence on his or her parents, a child of tender years has no real power to resist his or her parent's command, and every command contains an implicit threat of punishment for failure to obey. Under these circumstances, a minimal degree of force will satisfy the elements of forcible rape. *Id.*, paragraph one of the syllabus.
>
> *The same rationale does not apply to an adult*. No matter how reprehensible the defendant's alleged conduct, a woman over the age of majority is not compelled to submit to her father in the same manner as is a four-year-old girl. She is no longer completely dependent on her parents, and is more nearly their equal in size, strength, and mental resources. * * *
>
> A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit. A threat of force can be inferred from the circumstances surrounding sexual conduct * * * the element of force [cannot be proven] where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her.

(Emphasis added.) *Schaim* at 55.

{¶ 37} The court in *Dye*, which was decided after *Schaim*, specifically distinguished *Schaim* on the ground that *Schaim* involved the defendant's 20-year-old adult daughter "who was no longer completely dependent on her parents and was more nearly her father's equal in size, strength, and mental resources." *Dye* at 328.

{¶ 38} We note that, while *Eskridge*, 38 Ohio St.3d 56, N.E.2d 304, involved a child victim of tender years, its holding has been extended to minor victims as old as 17. *See State v. Dippel*, 10th Dist. Franklin No. 03AP-448, 2004-Ohio-4649 (defendant was 14-year-old victim's father); *State v. Kudla*, 9th Dist. Summit No. 27652, 2016-Ohio-5215 (victim raped by her father when she was between 14 and 17 years of age); and *State v. Clay*, 9th Dist. Medina No. 04CA0033-M, 2005-Ohio-6, ¶ 16 (defendant was 16-year-old victim's stepfather). However, the appellate courts have consistently adhered to *Schaim* and limited the application of *Eskridge*. In *State v. Johnson*, 7th Dist. Mahoning No. 08-MA-144, 2009-Ohio-6760, where the victim was raped by her stepfather on multiple occasions, the Seventh District explained that "[w]e must examine appellant's rape convictions under two separate standards. Because two counts of rape occurred when [the victim] was still a minor, we will examine them based on the *Eskridge*/*Dye* definition of force. However, because the third count of rape occurred when [the victim] was 22, we will examine it based on the *Schaim* definition of force." *Id*. at 44. Accordingly, the *Eskridge*'s alternative definition of force is inapplicable in this case, where the victim was no longer a minor at the time of the offense.[3]

---

[3] We note that, while *Eskridge* applies to a person standing in loco parentis, the application is also limited to a minor child. *See e.g.*, *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 75 (4th Dist.) ("To prove the element of force in a rape case involving a minor child when the offender stands in loco parentis, the force need not be physical or

{¶ 39} We are aware *Eskridge* has also been applied to cases of rape or gross sexual imposition in situations involving closely analogous relationships of disparate power between the defendant and victim. *State v. Heiney*, 2018-Ohio-3408, 117 N.E.3d 1034, ¶ 107 (6th Dist.). For example, in *State v. Oddi*, 5th Dist. Delaware No. 02CAA01005, 2002-Ohio-5926, the appellate court applied *Eskridge* to a driving instructor charged with GSI because the defendant, as the driving instructor of several 15-year-old victims, "was certainly in a position of authority, and held a certain amount of power" over the victims; in *State v. Roy*, 2014-Ohio-5186, 22 N.E.3d 1112, ¶ 37 (9th Dist.), the appellate court applied *Eskridge* to a 15-year-old victim fondled by her treating physician, reasoning that the defendant "used his position as a doctor to exert control over" the victim. Whether the offender is the victim's parent or holds a similar position of authority, the Supreme Court of Ohio has limited the application of *Eskridge's* alternative definition of force to a *child* victim. *State v. Torres*, 2023-Ohio-1406, 213 N.E.3d 287, ¶ 58 (4th Dist.). We recognize that in *State v. Fortson*, 8th Dist. Cuyahoga No. 92337, 2010-Ohio-2337, this court applied *Eskridge* to *adult* victims who were prisoners sexually abused by a corrections officer. *Fortson* is an outlier, however; while applying *Eskridge*, this court specifically acknowledged that "the *Eskridge* rule commonly applies to parent-child or other domestic situations, [but] we extend it to the unique facts of the case

---

brutal"); *State v. Shadoan*, 4th Dist. Adams No. 03CA764, 2004-Ohio-1756, ¶ 19; and *State v. Goff*, 154 Ohio App.3d 59, 69, 2003-Ohio-4524, 796 N.E.2d 50 (9th Dist.2003).

at hand [because] [i]t is undisputed that defendant, who was a corrections officer, was in a position of authority over his victims[.]"[4]

{¶ 40} The dissent concludes that *Eskridge's* definition of force applies to an adult child such as M.B. because George "holds a position of authority" over her, similar to the offender in *Fortson* over the adult victims. We note, however, that the state never alleged at trial that George is a "person of authority," only that he was M.B.'s stepfather. More importantly, there is no testimony by M.B. reflecting that George "held a certain amount of power or exerted control" over her. M.B.'s own testimony indicates that her relationship with George was superficial and minimal: she testified that George and her mother divorced when she was seven; after the divorce she lived with her mother; George moved to Texas after the divorce and was not involved in her life; when George returned to Cleveland, she would see George only when he came to her mother's house to pick up her siblings for visitation; and George "didn't really do anything for [her]" when she was between age 7 and 18. While *Fortson* applies *Eskridge* to adult victims, the facts of this case only reflect a

---

[4] We note the dissent also cites *State v. Pordash*, 9th Dist. Lorain No. 04CA008480, 2004-Ohio-6081, as a case analogous to *Fortson*. However, while citing *Eskridge*, the court in *Pordash* also cited facts unique to that case: the victims, who were digitally raped while being treated by defendant chiropractor, knew of defendant's extensive background in martial arts and each testified that they feared any resistance would lead to serious bodily harm. *Id.* at ¶ 12.

stepparent-child relationship and, for such cases, there are no precedents for an application of *Eskridge's* alternative definition of force.[5]

## Sufficient Evidence of Force Was Presented at Trial but the *Eskridge* Instruction Was Erroneous and Prejudicial

{¶ 41} While there is no testimony by M.B. that she was in fear because George directly or indirectly threatened her with the use of force, she testified that George grabbed her arm, stood her up, and sat her on his lap, causing her to urinate on herself during the breast-touching incident in the dining room. She also testified that George "bent" her over the toilet before engaging in vaginal intercourse with her. This evidence if believed, would be sufficient to satisfy the element of force required to sustain convictions for rape and gross sexual imposition under

---

[5] We also note that the state appears to argue in its brief on appeal that there was testimony to show that George was in loco parentis and therefore the jury could consider the alternative definition of force. The term "in loco parentis" is not statutorily defined. The Supreme Court of Ohio in *State v. Noggle*, 67 Ohio St.3d 31, 615 N.E.2d 1040 (1993) defined it as someone "who has assumed the dominant parental role and is relied upon by the child for support." This court has also observed that "merely having the legal status as a stepparent does not automatically cause the stepparent to stand in loco parentis to the stepchild." *State v. Primous*, 2020-Ohio-912, 152 N.E.3d 1002, ¶ 39 (8th Dist.), citing *State v. Erwin*, 1st Dist. Hamilton No. C-920293, 1993 Ohio App. LEXIS 1127 (Feb. 24, 1992) ("stepfather does not automatically stand in loco parentis to the child of his wife, but if the stepfather takes the child into his home, supports, educates, and assumes the duties of a parent, he consents to stand in loco parentis to a stepchild"). The state points to a comment made by the trial court that M.B.'s testimony indicated George was in loco parentis because he provided shelter after her mother died. Our review of M.B.'s testimony reflects otherwise. M.B. was staying with her father, her grandmother, and her girlfriend's family at different times after her mother died, and she was staying at George's house in the evening in question because George's children wanted her to see their new house and she had an argument with her girlfriend at that time. Regardless, as we point out in footnote 3, while *Eskridge* applies to a person standing in loco parentis, the application is also limited to a minor child.

R.C. 2907.02(A)(2) and 2907.05(A)(1). On cross-examination, M.B. testified that "there was no force" when asked if George forced her to go down to the basement or forced her into the shower. It is unclear whether her statement that "there was no force" also referred to George's conduct *after* both of them were in the shower. Because M.B.'s testimony reflects the use of some physical force or constraint by George, his claim that the state presented insufficient evidence to prove the offenses of rape and GSI alleged in Counts 3, 7, and 8 is without merit.

{¶ 42} Having found that sufficient evidence was presented as to the element of force, our inquiry does not end. In this case, the trial court provided the *Eskridge* instruction that force can be alternatively proven by evidence of subtle and psychological force when the defendant is the parent, stepparent, or person in loco parentis or other authority figure. Pursuant to *Schaim, Eskridge's* rationale "does not apply to an adult child. No matter how reprehensible the defendant's alleged conduct, a woman over the age of majority is not compelled to submit to her father in the same manner" as is a child of tender years. *Schaim,* 65 Ohio St.3d at 55, 600 N.E.2d 661.

{¶ 43} While M.B.'s testimony that she urinated on herself after the sexual contact in the dining room and was scared and crying during the sexual conduct in the basement shower may be sufficient to demonstrate that she was overcome by fear or duress and therefore satisfied the element of force pursuant to *Eskridge,* 38 Ohio St.3d 56, N.E.2d 304*, Eskridge* is limited by *Schaim,* and the alternate instruction of the definition of force given to the jury was not applicable because

M.B. was an adult at the time of the offenses. Because of this, the trial court's *Eskridge* instruction was erroneous.[6]

{¶ 44} The state concedes that *Eskridge* only applies to a minor victim; however, it argues on appeal that while M.B. was 18 at the time of the incident, *Eskridge* and *Dye,* 82 Ohio St.3d 323, 695 N.E.2d 763, should be applied because M.B. "acted in the same fearful way that a minor child would act." There is, however, no precedent extending *Eskridge's* holding to a victim who has reached the age of majority in cases involving a parental authority figure or domestic situation.

{¶ 45} In the instant case, there was no testimony that George used physical violence, but a showing of the use of violence is not required to sustain a conviction for rape or gross sexual imposition. Force is statutorily defined in the disjunctive as being the use of "violence, compulsion or constraint physically exerted." Although M.B. testified to physical acts that could be found to be constraint that would be sufficient to sustain the rape and gross sexual imposition convictions, the *Eskridge* instruction given to the jury allowed the jury to find the element of force proven solely by M.B.'s testimony that she was scared of her stepfather without any finding of "violence, compulsion or constraint physically extended." Because of the

---

[6] Pursuant to Crim.R. 30(A), a party may not assign an error on appeal regarding the giving of a jury instruction unless the party objects and "states specifically the matter objected to and the grounds of the objection." Our review of the transcript indicates that while arguing Crim.R. 29 motions and the propriety of jury instructions, defense counsel objected to the application of the law governing a minor child in sexual offenses to the instant case because M.B. was an adult. We find counsel had placed his objection on the record, albeit imperfectly, in satisfaction of the requirement of Crim.R. 30(A).

*Eskridge* instruction, the jury did not need to determine whether or not George used force as statutorily defined and the proof required of the state regarding an essential element of the offense was reduced improperly. *State v Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 97 ("Due process requires the state to prove beyond a reasonable doubt every element of the charged offense" and "[j]ury instructions that effectively relieve the state of its burden of persuasion violate a defendant's due process rights.").

{¶ 46} The record reflects that when the defense moved for a Crim.R. 29 acquittal based on the victim's testimony that there was no force, the state argued that force can be psychological and alluded to the OJI instruction regarding the alternative definition of force. The trial court accordingly provided the alternative definition for force even though the OJI's instruction on R.C. 2901.01(A)(1) specifically stated "this [*Eskridge*] instruction does not apply to an adult victim, even in a parent-child relationship" citing *Schaim,* 65 Ohio St.3d 51, 600 N.E.2d 66. The state, after contributing to the error regarding the erroneous jury instruction, further compounded the problem by heavily relying on the alternative definition of force in its closing argument: the state twice emphasized to the jury that force could be proven solely by M.B.'s testimony that she was scared of her stepfather, including reading verbatim the *Eskridge* instruction. Under these circumstances, the erroneous jury instruction was highly prejudicial and deprived the defendant of a constitutionally guaranteed fair trial. While we find George's conduct as testified to

by the victim reprehensible, we are bound by the Supreme Court of Ohio's precedent to reverse George's convictions of forcible rape (Count 3) and GSI (Counts 7 and 8).

**Insufficient Evidence for Sexual Battery Under R.C. 2907.03(5)**

{¶ 47} George was also convicted of Count 4 under Ohio's incest statute, R.C. 2907.03(A)(5). R.C. 2907.03(A)(5) prohibits sexual conduct when "[t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." Force is not an element of the incest statute. Rather, the state was required to prove that George stood in a certain relationship to M.B. ("natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person"). Count 4 of the indictment charged as, "being the Stepfather of [M.B.]," who engaged in sexual conduct with her.

{¶ 48} It is undisputed George and M.B.'s mother divorced in 2011. Citing *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, George contends that once a divorce occurs, the stepparent-stepchild relationship is dissolved and therefore his conduct did not constitute criminal incest as set forth in in R.C. 2907.03(A)(5). We find merit to his claim.

{¶ 49} In *Lowe*, the defendant was convicted of sexual battery in violation of R.C. 2907.03(A)(5) as a result of consensual sex with his 22-year-old stepdaughter. The defendant argued the statute is unconstitutional when applied to "consensual sexual conduct between adults related only by affinity." *Id.* at ¶ 4. The Supreme Court found the statute constitutional and held that the plain language of the statute

"clearly prohibits sexual conduct with one's stepchild while the stepparent-stepchild relationship exists. It makes no exception for consent of the stepchild or the stepchild's age." *Id.* at ¶ 15.

{¶ 50} Notably, the court added that if the defendant divorced his wife and no longer was a stepparent to his wife's daughter, the stepparent-stepchild relationship would be dissolved and the statute would no longer apply to him. *Id.* at ¶ 26. *See also Noble v. State*, 22 Ohio St. 541, 541 (1872) ("The relation of stepfather and stepdaughter, within the meaning of the statute against incest, does not exist after the termination of the marriage relation between the stepfather and the stepdaughter's mother"), and *State v. Brown*, 47 Ohio St. 102, 23 N.E. 747 (1890) ("[t]he supposed hardship of the law is much mitigated by the circumstance that kinship by affinity of the husband and wife, respectively, with the family of the other terminates with the dissolution of the marriage"). Pursuant to the binding precedent from Supreme Court of Ohio, George's conviction of sexual battery under R.C. 2907.03(A)(5) must be also reversed due to insufficient evidence. *Accord State v. Blair*, 11th Dist. Portage No. 2012-P-0145, 2013-Ohio-3477 (defendant could not be convicted of sexual battery under R.C. 2907.03(A)(5) against a stepchild after defendant's marriage with his wife was dissolved by his wife's death).[7]

---

[7] Regarding the sexual battery count, the state argues on appeal that the plain language of R.C. 2907.03(A)(5) prohibits sexual conduct with the victim when the offender is in loco parentis of the victim and also that there is evidence for Geroge's standing in loco parentis. The state therefore claims the jury was properly instructed on in loco parentis

## Conclusion

{¶ 51} Based on the foregoing analysis, we sustain the first and fourth assignments of error. We further sustain the fifth assignment of error in part as to Count 4 only. Our disposition of these assignments of error render moot the second, third, sixth, and seventh assignments of error. George's convictions of rape and GSI on Counts 3, 7, and 8 are reversed because of the errant and prejudicial jury instruction regarding the element of force. We remand these three counts to the trial court for a new trial. George's conviction of sexual battery under R.C. 2907.03(A)(5) on Count 4 is reversed because of insufficient evidence and the trial court is to vacate his conviction of sexual battery upon remand.

{¶ 52} Judgment reversed, and case remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover of appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

---

regarding sexual battery and his conviction of that offense is supported by sufficient evidence. The state's claim lacks merit because the indictment charges George with engaging in sexual conduct with the victim *while "being the stepfather"* of the victim and the trial court instructed the jury accordingly. Therefore, regardless of whether M.B.'s testimony indicates George was standing in loco parentis, the jury did not consider (or should not have considered) that alleged relationship in finding George guilty of sexual battery.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

ANITA LASTER MAYS, P.J., CONCURS:
LISA B. FORBES, J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE OPINION)

LISA B. FORBES, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 53} I respectfully concur in part and dissent in part with the majority opinion. I agree that George's conviction of sexual battery pursuant to R.C. 2907.03(A)(5) must be reversed. I agree that there was sufficient evidence of force produced at trial to support George's convictions for forcible rape and GSI. However, I disagree and write separately because I do not believe that the jury instruction regarding the alternate definition of force was given in error.

{¶ 54} The court instructed the jury that the definitions of force are as follows:

Force. Force means any violence, compulsion or constraint physically exerted by any means upon or against a person or thing. Threat includes direct or indirect threat.

Force of a parent or other authority figure. When * * * George is the parent, stepparent or person in loco parentis or other authority figure to [M.B.], the element of force need not be openly displayed or physically brutal. It can be subtle, slight, and psychological, or emotionally powerful. Evidence of express threat or harm or evidence of significant physical restraint is not required.

{¶ 55} I disagree with the majority because I would find that the instruction presents an accurate statement of the law applicable to the case at hand. "Force" is defined by R.C. 2901.01(A)(1) as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." This definition applies to charges of rape and GSI that are based on "force or threat of force." R.C. 2907.02(A)(2); 2909.05(A)(1).

{¶ 56} The Ohio Supreme Court held that "[t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and the relation to each other." *Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304, at paragraph one of the syllabus. The court explained that "[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id*. at 58-59, citing *State v. Martin*, 77 Ohio App. 553, 68 N.E.2d 807 (9th Dist.1946); *State v. Wolfenberger*, 106 Ohio App. 322, 154 N.E.2d 774 (12th Dist.1958). In *Eskridge,* a father was convicted of raping his four-year-old child while he was watching the child. The court noted that the father "held a position of authority over [the victim] which did not require any explicit threats or displays of force." *Id*. at 59.

{¶ 57} The law regarding what evidence of force is required was further developed in *Schaim*, 65 Ohio St.3d at 54, 600 N.E.2d 661, where a father was accused of raping his 20-year-old daughter. The Ohio Supreme Court held that

[a] defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit. A threat of force can be inferred from the circumstances surrounding sexual conduct, but a pattern of incest will not substitute for the element of force where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her.

*Id.* at paragraph one of the syllabus.

{¶ 58} Where a defendant holds a position of authority over an alleged rape victim, various Ohio courts have recognized that this dynamic is relevant to assessing the element of force. *See, e.g., Fortson*, 8th Dist. Cuyahoga No. 92337, 2010-Ohio-2337 (applying *Eskridge* in upholding GSI convictions where a corrections officer held a position of authority over his adult female victims who were prisoners); *State v. Pordash*, 9th Dist. Lorain No. 04CA008480, 2004-Ohio-6081 (applying *Eskridge* in upholding forcible rape convictions where a chiropractor's relationship with his victims, who were his patients, was relevant to the analysis of whether there was sufficient evidence of force).

{¶ 59} In reviewing the trial court's decision to give the jury instructions at issue here, I am guided by the following principle: "it is well established that the trial court will not instruct the jury where there is no evidence to support an issue." *Musil v. Truesdell*, 8th Dist. Cuyahoga No. 93407, 2010-Ohio-1579, ¶ 10, citing *Riley v. Cincinnati*, 46 Ohio St. 2d 287, 348 N.E.2d 135 (1976). *See also State v. Williams*, 8th Dist. Cuyahoga No. 95748, 2011-Ohio-5385, ¶ 32, citing *Feterle v. Huettner*, 28 Ohio St.2d 54, 275 N.E.2d 340 (1971), at syllabus ("In reviewing a record to ascertain

the presence of sufficient evidence to support the giving of an * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.").

{¶ 60} I would find that the trial court properly instructed the jury. As recognized by the majority, M.B. testified that George lifted her onto his lap in the dining room and later bent her over the toilet before having sex with her. She further testified that she considered George to be an authority figure. Notwithstanding the fact that George was M.B.'s former stepfather, M.B. still regarded him as a father figure. M.B. testified that she regarded George "as a stepfather" and she called him dad. The state introduced evidence that M.B., who was an adult at the time of the incident, believed that George might use physical force against her. M.B. testified that she was so scared during her encounter with George in the dining room when he touched her breasts and pulled her to sit on his lap that she urinated on herself. When George gave her his phone and went to get a towel she said that she did not call the police because she felt "like anything could have happened before the police got there, and he would have seen the calls on his phone." M.B. further testified that she could not say no "[b]ecause [she] was scared." She described herself as going "into panic mode" and as being "in shock that someone that I call my dad wanted to have sexual intercourse with me." This evidence meets the force element required for rape and GSI.

{¶ 61} In my opinion, under the totality of the circumstances, the trial court correctly instructed the jury on the element of force. The instruction correctly states

the applicable law, and the record contains evidence supporting the use of the alternative definition of force. *See State v. Dew*, 7th Dist. Mahoning No. 08 MA 62, 2009-Ohio-6537, ¶ 113 (finding that a trial court did not abuse its discretion in giving a jury instruction when "the court properly stated the law * * * that where the defendant holds some position of authority over the victim, the force may be more subtle or psychological in nature. Further, the court properly instructed the jury that to find force, it must find that the victim's will was overcome by fear or duress.").

{¶ 62} Accordingly, I respectfully concur in part and dissent in part.