[Cite as *State v. Edwards*, 2025-Ohio-5708.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2024-T-0085 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| MICHAEL EDWARDS, | |
| Defendant-Appellant. | Trial Court No. 2024 CR 00126 |

## OPINION AND JUDGMENT ENTRY

Decided: December 22, 2025
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Charles L. Morrow*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Frank L. Casse*se and *David J. Betras*, Betras Kopp, L.L.C., 6630 Seville Drive, Youngstown, OH 44406 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Appellant, Michael Edwards, appeals the judgment of the Trumbull County Court of Common Pleas, sentencing him to an aggregate prison term of a minimum of 34 years to a maximum of 39 years after a jury found him guilty of four counts of gross sexual imposition ("GSI") with firearm specifications, two counts of extortion, three counts of sexual battery with firearm specifications, two counts of theft in office, two counts of dereliction of duty, and two counts of rape with firearm specifications. Edwards' convictions stem from various sexual offenses he committed against vulnerable women while on duty as a City of Warren Police Officer.

## Indictments

{¶2}    On March 8, 2024, a Trumbull County Grand Jury indicted Edwards on 16 counts, including GSI with firearm specifications, rape with firearm specifications, sexual battery with firearm specifications, theft in office, dereliction of duty, and extortion, arising from alleged offenses he committed against two alleged victims, M.M. and K.D.  After Edwards' indictment was made public, four additional alleged victims came forward, A.R., L.H., C.B., and A.P., and a grand jury issued superseding indictments on March 21 and April 30, 2024.

{¶3}    The April 30 superseding indictment charged Edwards with 24 counts: Counts 1, 2, 5, 6 and 17: GSI, fourth-degree felonies with firearm specifications, in violation of R.C. 2907.05(A)(1) and (C)(1), and 2941.141; Count 3: extortion, a third-degree felony, in violation of R.C. 2905.11(B)(4); Count 4: extortion, a third-degree felony, in violation of R.C. 2905.11(B)(5)[1]; Counts 7, 9, and 20 through 24: rape, a first-degree felony with firearm and sexually violent predator specifications, in violation of R.C. 2907.02(A)(2) and (B), 2941.141, and 2941.148; Count 13: rape, a first-degree felony with a firearm specification, in violation of R.C. 2907.02(A)(2) and (B), and 2941.141; Counts 8, 10, and 14: sexual battery, third-degree felonies with firearm specifications, in violation of R.C. 2907.03(A)(1) and (B)(1), and 2941.141; Counts 11 and 15: theft in office, fourth-degree felonies, in violation of R.C. 2921.41(A)(1) and (B); Counts 12 and 16: dereliction of duty, second-degree misdemeanors, in violation of R.C. 2921.44(E) and (F); Count 18: menacing by stalking, a fourth-degree felony with a firearm specification, in

---

1.  Erroneous code sections were stated in the indictment for Counts 3 and 4, extortion.  Thus, instead of R.C. 2905.11(B)(4) and 2905.11(B)(5), the indictment listed the statute sections as R.C. 2905.11(A)(4) and (B), and 2905.11(A)(5) and (B), respectively.

Case No. 2024-T-0085

violation of R.C. 2903.211(A)(1), (3), and (B)(2)(f), and 2941.141; and Count 19: attempted GSI, a fifth-degree felony with a firearm specification, in violation of R.C. 2923.02(A), 2907.05(A)(1) and (C)(1), and 2941.141.

**Joinder of Offenses**

{¶4}   As relevant to this appeal, Edwards filed a "motion for relief from prejudicial joinder and separate trial," in which he argued a single trial would be highly prejudicial and the alleged crimes against the additional victims are "pile-on charges."  The State filed a response in opposition, arguing (1) Edwards failed to demonstrate any prejudice; (2) pursuant to Evid.R. 404(B)(2), if the cases were tried separately, evidence of the charged offenses would necessarily be admissible at trial for the other charged offenses to show Edwards' motive, intent, identity, knowledge, opportunity, modus operandi, and as a common plan or scheme; and (3) each count in the indictment is simple and direct as to each specific victim, in a specific place, and on a specific date/date range.  Following a hearing on the motion (of which no transcript was filed on appeal), the State filed proposed findings of fact and conclusions of law, and Edwards filed a post-hearing brief.

{¶5}   On May 30, 2024, the trial court issued a judgment entry overruling Edwards' motion.  The trial court found joinder was proper because the evidence would be admissible at trial for the separate victims as "other acts" evidence pursuant to Evid.R. 404(B)(2).  The court further found the evidence of each crime was simple and direct and would not confuse the jury.  In addition, the court noted it would give a specific instruction to the jury that each count and each victim should be considered on its own evidence and not be influenced by the other counts.  Edwards made a "motion to reconsider relief from

Case No. 2024-T-0085

prejudicial joinder and for separate trials" prior to the start of trial, which the court overruled.

**Jury Trial and Sentencing**

{¶6} A six-day jury trial was held in which the State presented numerous witnesses and evidence that revealed Edwards, while on patrol, armed, and in full police uniform, engaged in a pattern of preying on vulnerable women to commit various sexual offenses. Five of the six victims were drug addicts and/or sex workers, who were either homeless, living in "flop houses," or renting rooms at the Riverview Motel in the City of Warren. The sixth victim was a single mother with four young children; Edwards had responded to a call she made to 9-1-1 regarding her neighbor.

{¶7} The first victim, M.M., was a sex worker and drug addict living in the Riverview Motel. She had seen Edwards several times before in his capacity as a police officer. Edwards had stopped M.M. when she was walking to a gas station one night, and on another occasion, Edwards was one of the officers responding to a 9-1-1 call M.M. had made regarding her ex-boyfriend. On January 14, 2024, Edwards was the off-duty police guard at the Solace Center where M.M. went to exchange visitation of her minor child with the child's father. M.M. testified that while she was there, Edwards asked her if she was still residing at the motel and told her he would stop by the motel later to discuss her prostitution.

{¶8} Later that night, while on duty, in uniform, and armed, Edwards went to M.M.'s motel room where she was using drugs alone. He asked her if the Solace Center knew she was "on drugs and living at [a] hotel," and asked her what she was willing to do

Case No. 2024-T-0085

for him to stay quiet. Edwards touched her on her chest and buttocks. He told M.M. he would come back the next time he worked.

{¶9} On January 19, 2024, M.M. was "getting high" with friends in her motel room. At approximately 1:30 a.m., Edwards parked his patrol car in the parking lot, docked his body camera in the vehicle's docking station, and knocked on M.M.'s door. Edwards was wearing his uniform, which included his taser and police-issued firearm. M.M.'s friends ran into the bathroom leaving the drugs in plain sight. Edwards told M.M. to make her friends leave and he would return in 15 minutes. M.M. hid a cellular phone in the room to record their encounter because she was afraid no one would believe her. She was "scared, and she was afraid of losing visitation with her child and of being arrested. She could not go to her mother's house because of a child-custody court order concerning her two younger children. When Edwards returned approximately 20 minutes later, they engaged in several sexual acts, including oral sex. Edwards did not remove the belt holding his firearm and taser, merely unzipping his pants, and later told M.M. no one would believe her. After Edwards ejaculated in her mouth, M.M. collected his semen, which was later verified as belonging to Edwards through DNA testing.

{¶10} M.M. was initially afraid to notify the police. Several days later, a friend gave her the personal phone number of a City of Warren police detective. M.M. texted the detective, informing him of her encounter with Edwards and sent him one of the videos. The Warren Police Department opened an internal investigation and requested assistance from the Ohio Bureau of Criminal Investigation ("BCI"). Edwards' body camera revealed he was at the Riverview Motel on the two nights in question and corroborated

Case No. 2024-T-0085

M.M.'s testimony of the timeline of events. One officer testified it was a violation of the police department's rules to remove a body camera while on duty for any reason.

{¶11} K.D., a recovering alcoholic and drug addict, testified that in 2023 she was "engulfed" in her addiction. She first encountered Edwards when he responded with several other officers to a drug overdose of an acquaintance at her house. She was never charged with possessing a bag of methamphetamine the officers had found on the scene. Several weeks later, in March 2023, Edwards approached her in a parking lot, where she was sitting with her boyfriend in her broken-down vehicle. They were both under the influence, and she did not have a driver's license. Edwards knocked on the window and asked her if she remembered him. He told her the drugs the officers had found while responding to the overdose had "been disposed of." K.D. saw him "a number of times" after that, including at the gas station and when she was sitting outside at night. Edwards would drive by in his patrol car and "shine his spotlight" to catch her attention. She would approach his patrol car and talk to him. She recalled another instance where she saw Edwards with several other officers at a gas station. He told her to wait until they left since he knew she was driving without a valid driver's license.

{¶12} In another incident, K.D. had lost consciousness from drug use while in her car. Someone saw her and called emergency services. Edwards drove up with another officer and told the paramedics to let her go. He knew she did not have a valid driver's license. K.D. drove home and again lost consciousness in her vehicle in her driveway. Edwards, who had followed her home, assisted her into the house.

{¶13} One night in the fall of 2023, around 2:00 a.m., Edwards drove by in his patrol car. K.D. was in her vehicle in the driveway and had been using so many drugs

Case No. 2024-T-0085

she felt "borderline blackout." Edwards called her over, and she followed him in her vehicle to a warehouse at the end of her street where he performed oral sex on her in his uniform, with his handgun on his belt. K.D. testified the sexual acts with Edwards were consensual, non-threatening, and she didn't "think she was scared." She also testified there was a "power dynamic," his presence as a police officer was "a little intimidating," he never threatened her, and she followed him voluntarily with the understanding that some sexual conduct would occur.

{¶14} In October 2023, K.D. was involved in a police chase. She mentioned her sexual encounter with Edwards to the arresting officer. In February 2024, while she was awaiting an arraignment in Warren Municipal Court, detectives from BCI interviewed her regarding Edwards.

{¶15} A.R., who is recovering from drug and alcohol abuse, was living in Warren at an apartment and "different places," "running the streets" during the summer and fall of 2023. She would walk everywhere, and she encountered Edwards when he was on duty and out on patrol "a couple times a week for months." He would pull over and ask her how she was doing. Eventually Edwards became more forward, even when she was with her boyfriend. Edwards would show up "out of nowhere." One night, A.R. was at the gas station talking to Edwards, who was sitting in his patrol car. She asked him about his wedding ring because he had previously told her he was not married. Edwards grew upset, then told her she was "looking good" and asked her for some pictures of herself while he was physically holding onto her arm. A.R. testified, "He always knew where I was. He knew where to find me. He knew when to show up."

{¶16} L.H. testified that she knew Edwards her whole life. Edwards worked for her family's business when they were in high school. In the summer and fall of 2023, she was living at the Riverview Motel, prostituting "somewhat" and using drugs. Edwards called her room and came over while on duty and in uniform. L.H.'s boyfriend was in the room, sleeping. Edwards put his hands on her breasts and said, "Honk, honk." L.H. told him he was "not allowed to do that" and she wanted him to leave.

{¶17} A.P., a recovering drug addict and sex worker, was living in Warren in late 2019, early 2020. She was homeless and eventually found a place to stay in a "flop house." She encountered Edwards "pretty much the first day" she was staying at the house. Edwards' patrol car sat in front of the house for hours, and she realized "something wasn't right with it." Everyone in the house, herself included, ended up leaving, and the patrol car followed them. "Every stop that we made, everywhere we went, to a house, to a gas station, he was trailing behind." No one else seemed concerned about it. In the ensuing days, Edwards would sit outside the house "very often," "a few days a week."

{¶18} One day in early 2020, A.P. found Edwards standing with the homeowner in the area between the kitchen and living room. Edwards was "in full police uniform," and he was laughing and joking with the homeowner. Drug paraphernalia was in plain view in A.P.'s room and in other places of the house. Edwards told A.P. he wanted to speak with her and led A.P. to her room. She did not want to refuse because he was a police officer. Edwards closed the door and began touching her. She remembered pushing his hand away. When Edwards started taking off both of their clothing, A.P. said "no," but he proceeded and then forced vaginal intercourse. She was "very scared." A.P.

Case No. 2024-T-0085

testified there were several more encounters while she was staying at that house, where Edwards would compel sexual acts, including oral sex. A.P. believed Edwards had some sort of relationship with the homeowner because she would freely invite Edwards into the home. A.P. testified she had nowhere else to go, and she was "deep in her addiction."

{¶19} In February 2020, A.P. left the house and was homeless until she ended up living in someone else's house. She encountered Edwards one day while she was walking with a male friend. She was relieved she was accompanied by a male. After trying to talk to her, Edwards followed them. He drove a little bit ahead of them and then stopped his patrol car and waited for them to walk past. Edwards continued to do this until they arrived at their destination, at which point Edwards sat outside the house in his patrol car. A.P. felt she could not call the police, because "he is the police."

{¶20} In 2021, A.P. moved to another house to watch a friend's dog while her friend was serving a jail sentence. Edwards did not know where she was. However, in late February, she called the police for assistance and Edwards responded to the call. Edwards started "the same cycle sitting outside the house, circling the house, driving by." There were several more incidents involving oral sex. He would just "come banging on the door." He was always in uniform and on duty. Eventually, A.P. was arrested at the house by a bondsman, who informed her that he had located her based on information relayed to him by Edwards.

{¶21} In April 2022, A.P. was released from her sentence, and she rented a house. She started using drugs again, and in January 2023, one of her friends overdosed at her house. Edwards was one of the officers who responded to the call, and he told her he would be back. Edwards started the same pattern of sitting outside her house in his

patrol car. On one occasion, a friend told Edwards to leave. In the following days, A.P. set up a camera and recorded him circling her home, which was played to the jury. A.P. went to jail shortly after, on February 7, 2023. In 2024, she was living in Cleveland when she discovered Edwards had been arrested.. A.P. reported the incidents to the Warren police.

{¶22} In March 2023, C.B., a single mother of four young boys, was living in an apartment in the City of Warren. She would see Edwards when she walked home with her children. Edwards would sit in her alleyway by the playground and talk to the boys. C.B. would see Edwards at the apartment complex "every couple of days." She reported several instances to the police about an ex-boyfriend who would sit in the apartment complex and disturbances from a neighbor. After one of those reports to the police, Edwards knocked on her door. After she answered, Edwards came inside, closed the door, and locked it. He told C.B.'s children to go upstairs and asked her if she "could do him a favor." Edwards proceeded to pull out his penis and forced her head down for oral sex. In 2024, C.B. saw the article in the newspaper that Edwards had been arrested and reported the incident to an officer.

{¶23} At the close of the State's evidence, the trial court granted the defense's Crim.R. 29 sufficiency of the evidence motion as to Count 19, attempted GSI with its firearm specification, and the counts of the superseding indictment were renumbered.

{¶24} As relevant to the instant appeal, defense counsel objected to the jury instruction on "force of authority figure." Defense counsel argued this instruction does not apply to a police officer. The trial court overruled the objection and gave the following instruction to the jury:

Force:  Force means any violence, compulsion, or constraint physically exerted by any means upon or against any person or thing.  If you find beyond a reasonable doubt that under the circumstances in evidence the victim's will was overcome by fear, duress, or intimidation, the element of force has been proved.

When the relationship between the victim and the Defendant is such that the Defendant is an authority figure, the element of force need not be openly displayed or physically brutal.  It can be subtle or slight and psychologically or emotionally powerful.  Evidence of an expressed threat of harm or evidence of significant physical restraint is not required.  If you find beyond a reasonable doubt that under the circumstances in evidence the victim's will was overcome by fear, duress, or intimidation, the element of force has been proved.

{¶25}  At the end of the State's closing argument, defense counsel objected that it was too late to begin the defense's closing argument.  The court had finished instructing the jury around 3:30 p.m., and the State had taken an hour for its closing argument.  The court overruled the objection, finding "it would be unfair to split it up."  Defense counsel's closing argument lasted approximately 30 minutes, using half the time allotted.  After the jury proceeded to deliberations, defense counsel made an oral motion for a mistrial, arguing the defense was not given the same consideration as the State and had to cut short their closing argument.  The court overruled the motion, noting it had advised defense counsel they had the same amount of time as the State, one hour, and defense counsel chose not to use it.

{¶26}  While the jury was deliberating, the jury asked the court, "If the victim says sex was consensual and non-threatening, could it still be considered rape?"  In an in-chambers hearing, the court proposed answering the question, "That issue is for your determination."  Defense counsel objected, arguing the court should answer, "If it's consensual, it's not rape."  The trial court overruled the objection, finding it was a determination of fact, and answered the jury's question accordingly.

{¶27} Defense counsel moved for a mistrial on the second day of jury deliberations based on the jury's question and the authority-figure jury instruction. Defense counsel argued that notwithstanding the authority-figure instruction, if the jury found an act was consensual and there was no force, the jury should find the defendant not guilty. The State argued this was a factual determination for the jury, especially as it pertained to the victim K.D. who testified it was consensual and non-threatening, but Edwards was in a "power position" since he was armed and could arrest and detain her. The trial court orally overruled the motion.

{¶28} The jury found Edwards "guilty" of Counts 1, 2, 5, and 6, GSI with firearm specifications; Counts 3 and 4, extortion; Counts 8, 10, and 14, sexual battery with firearm specifications; Counts 11 and 15, theft in office; Counts 12 and 16, dereliction of duty; and Counts 19 and 23, rape with firearm specifications.

{¶29} At the sentencing and sexually violent predator hearing, the trial court considered whether any offenses were allied offenses of similar import. The court found Counts 3 and 4 (extortion) merged for sentencing purposes, and the State elected to proceed on Count 4; the firearm specifications in Counts 1 and 2 merged, and the State elected to proceed on Count 1; the firearm specifications in Counts 5, 6, 8, and 10 merged, and the State elected to proceed on Count 8. The court found merger was not required for the remaining offenses because they were separate as to location, time, victim, and/or animus.

{¶30} The court sentenced Edwards to the following:

**Count 1:** GSI, a prison term of 18 months, plus a concurrent 1-year prison sentence on the firearm specification;
**Count 2:** GSI, a prison term of 18 months;
**Count 4:** extortion, a prison term of 36 months;

**Count 5:** GSI, a prison term of 18 months;

**Count 6:** GSI, a prison term of 18 months;

**Count 8:** sexual battery, a prison term of 60 months, plus a 1-year prison term on the firearm specification to be served prior to and consecutively to all other sentences;

**Count 10:** sexual battery, a prison term of 60 months;

**Count 11:** theft in office, a prison term of 12 months;

**Count 12:** dereliction of duty, 90 days in jail, to be served concurrent to all other counts;

**Count 14:** sexual battery, a prison term of 60 months, plus a 1-year prison term on the firearm specification to be served prior to and consecutively to all other sentences;

**Count 15:** theft in office, a prison term of 12 months;

**Count 16:** dereliction of duty, 90 days in jail, to be served concurrent with all other counts;

**Count 19:** rape, a mandatory indefinite prison term of a minimum of 10 years up to a maximum of 15 years, plus a 1-year prison sentence on the firearm specification to be served prior to and consecutively to all other sentences;

**Count 23:** rape, a prison term of 10 years plus a 1-year prison term on the firearm specification to be served prior to and consecutively to all other sentences.

{¶31}  The court ordered the prison terms in Counts 8, 14, 19, and 23 and their attendant firearm specifications to be served consecutively to each other, and all other counts, including the firearm specification on Count 1, to be served concurrently for an aggregate prison sentence of a minimum of 34 years up to a maximum of 39 years.

{¶32}  Lastly, the trial court found Edwards is a Tier III sex offender and advised him of his duties to register.

{¶33}  Edwards timely filed his appeal and raises five assignments of error for our review:

[1.]  The trial court erred in providing a jury instruction pursuant to OJI-CR 507.02(A)(1)(12), Force of a Parent or Other Authority Figure, as the alleged victims did not testify that they believed physical force would be used in the absence of submission.

[2.]  The trial court erred by denying the Appellant's Motion for Severance.

[3.] The trial court erred in not properly instructing the jury after receiving a question from the jury as to whether an act is rape if the victim says sex was consensual and non-threatening.

[4.] The Appellant's Sixth Amendment right to a fair trial was violated when the prosecution finished its initial closing arguments after 4 pm and the Court forced the defense to render its closing argument even though the jury showed obvious signs of fatigue and exhaustion.

[5.] The Appellant was denied a fair trial because of the cumulative error.

### "Force of Authority Figure" Jury Instruction

{¶34} In his first assignment of error, Edwards contends the trial court erred by giving a jury instruction on "force of a parent or other authority figure," pursuant to *Ohio Jury Instructions*, CR § 507.02(A)(1)(12) (Rev. Jan. 22, 2011), because the victims did not testify that they believed physical force would be used in the absence of submission and the force element cannot be met simply because Edwards is a police officer.

{¶35} "This court generally reviews jury instructions under an abuse of discretion standard so long as the instruction is a correct statement of law." *State v. Kessler Scott*, 2022-Ohio-4054, ¶ 44 (11th Dist.). "If the instruction was not a correct statement of law, appellate courts review the instruction de novo to "'determine whether the incorrect jury instruction probably misled the jury in a matter materially affecting the complaining party's substantial rights.'"" *Id*., quoting *State v. Kovacic*, 2010-Ohio-5663, ¶ 17 (11th Dist.), quoting *Humphrey v. Belmont*, 1998 WL 670669, *2 (7th Dist. Sept. 24, 1998). A conviction will not be reversed based upon jury instructions unless the erroneous instructions amount to prejudicial error. *State v. Dehass*, 10 Ohio St.2d 230 (1967), paragraph two of the syllabus.

{¶36} Edwards was convicted of two counts of rape against C.B. and A.P. and four counts of GSI against M.M., and their attendant firearm specifications.

Case No. 2024-T-0085

{¶37} Pursuant to R.C. 2907.02(A)(2), rape, "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Pursuant to R.C. 2907.05(A)(1), GSI, "[n]o person shall have sexual contact with another; cause another to have sexual contact with the offender; or cause two or more other persons to have sexual contact when . . . [t]he offender purposely compels the other person, or one of the other persons, to submit by force or threat of force." Pursuant to R.C. 2907.05(D), "[a] victim need not prove physical resistance to the offender . . . ." The force element needed to prove the offense of GSI is the same for the offense of rape. *In re P.V.*, 2024-Ohio-2324, ¶ 49 (11th Dist.), citing *State v. Riggs*, 2005-Ohio-5244, ¶ 20 (10th Dist.).

{¶38} "Force" is statutorily defined in the disjunctive as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1); *State v. George*, 2024-Ohio-471, ¶ 45 (8th Dist.). The Supreme Court of Ohio has held only minimal force or threat of force is required. *State v. Dye*, 82 Ohio St.3d 323, 328 (1998) ("In fact, [the statute] requires only that minimal force or threat of force be used in the commission of the rape."). Further, "there is no requirement under Ohio law that a victim resist in order for a defendant's act to be forceful." *State v. Poole*, 2019-Ohio-3366, ¶ 33 (8th Dist.); *accord State v. Shannon*, 2004-Ohio-1669, ¶ 94 (11th Dist.) ("a victim is not required to prove physical resistance in a rape prosecution"). "Threat of force" occurs when the defendant "creates the belief that physical force will be used if the victim does not submit [and] can be inferred from the circumstances surrounding sexual conduct . . . ." *State v. Schaim*, 65 Ohio St.3d 51 (1992), paragraph one of the syllabus.

{¶39} Edwards' argument that the force or threat of force element is absent without the "parent-authority figure" instruction is belied by the evidence. In the case of A.P., Edwards, while carrying his firearm and taser in his holster, directed A.P., who had been using drugs that were in plain view in her room, to go into her room. He shut the door and began taking off their clothing, "bent her over," and proceeded to compel vaginal sex. A.P. testified she was "scared" so she followed him into her room; she pushed his arm away and said "no, eventually, like, as things started to progress" while he was taking off their clothing; and she was "terrified," "like fight or flight." She did not want to do the wrong thing "because he was a cop." Edwards told her "something along the lines, like, if I told, you know, because I was a junky, nobody was going to believe me."

{¶40} In the case of C.B., Edwards entered her apartment under the guise of responding to a police report and closed and locked her door. He was wearing his firearm and taser in his holster. He directed her children to go upstairs, and he asked her if she "could do him a favor." C.B. testified she was "just frightened." He "forcefully" "sat her down on the ottoman" by grabbing her and putting his hand on her shoulder, whereupon "he pulled out his penis." Edwards proceeded to shove her head towards his genitals. After he ejaculated in her mouth, he told C.B., "Do not say anything, keep this between us."

{¶41} In the case of M.M., Edwards went to her motel room in the middle of the night, with his firearm in his holster, where she was intoxicated with illegal drugs in plain view. He directed M.M. to get rid of her friends and told her he would be back. When Edwards returned approximately 20 minutes later and they engaged in sexual acts, he

Case No. 2024-T-0085

never took off his firearm and taser. He pulled down his zipper and directed her to perform oral sex. M.M. testified she was scared; "who was going to believe me over him."

{¶42} Thus, force or threat of force is not simply inferred from the fact that Edwards was in uniform. There was ample evidence of actual force and/or threat of force to support each conviction. The actions of having a deadly weapon under one's control, isolating the victims in their rooms, taking off their clothes, forcing them in position, et cetera, is sufficient to show the element of force or threat of force, i.e., "violence, compulsion, or *constraint physically exerted*," in this case. This court and our sister courts have found sufficient evidence of force or threat of force under similar circumstances. *See State v. Williams*, 2006-Ohio-1169, ¶ 40 (11th Dist.) (sufficient evidence of force where the defendant's conduct included "putting the victim on a hard floor, taking off her shorts, and engaging in vaginal intercourse which caused her pain"); *Shannon*, 2004-Ohio-1669, at ¶ 95 (11th Dist.) (sufficient evidence of force where the defendant laid on top of the victim and proceeded to have intercourse with her after she conveyed her lack of consent); *State v. Whitt*, 2003-Ohio-5934, ¶ 22 (8th Dist.) (sufficient evidence of force where the defendant removed the victim's dress and underwear without her consent); *State v. Williams*, 2017-Ohio-5598, ¶ 4 (10th Dist.) (sufficient evidence of force where the defendant climbed on top of the victim, forced himself on her, and held a gun to her head); *State v. Lyons*, 2005-Ohio-4649, ¶ 4 (11th Dist.) (sufficient evidence of force where the defendant asked the victim to go inside her home, held a gun to her head, threatened her not to tell anyone, and then forcefully engaged in sexual conduct).

{¶43} Edwards takes issue with the trial court's *Eskridge* "parental-authority figure" jury instruction, and the State urges us to extend this instruction beyond a parent-

Case No. 2024-T-0085

minor child relationship to positions of authority generally. In *State v. Eskridge*, 38 Ohio St.3d 56 (1998), the Supreme Court of Ohio explained there is inherent coercion in parental authority," thus, "[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id*. at 58-59. The court of appeals in that case had vacated Eskridge's conviction for raping his 4-year-old child because the court believed R.C. 2907.02(B) required "'an additional quantum of force or coercion.'" *Id.* at 58. The Supreme Court reversed and reinstated Eskridge's conviction, finding there was substantial evidence upon which a court could reasonably conclude that all the elements of the offense had been proven beyond a reasonable doubt. *Id.* at 59.

{¶44} The holding in *Eskridge* has been extended by a few courts to rape or GSI convictions in situations involving close relationships of disparate power between the defendant and the victim. *See, e.g. State v. Fortson*, 2010-Ohio-2337, ¶ 86 (8th Dist.) (upholding GSI convictions where a corrections officer held a position of authority over his adult female victims who were prisoners); *State v. Pordash*, 2004-Ohio-6081, ¶ 12 (9th Dist.) (upholding rape convictions where a chiropractor's relationship with his adult victim-patients was relevant to whether there was sufficient evidence of force); *but see State v. George*, 2024-Ohio-471, ¶ 40 (8th Dist.) (declining to apply *Eskridge* where the stepfather committed acts of rape and GSI against his adult stepdaughter).

{¶45} In this case, there is sufficient evidence to meet the element of "force or threat of force," and the additional "authority figure" instruction was unnecessary. Thus, even if the instruction was given in error, it does not rise to the level of such prejudice that

Case No. 2024-T-0085

reversible error occurred and a new trial should be ordered. Therefore, we decline to speculate whether *Eskridge* can be extended to other "authority relationships" based on the circumstances presented herein.

{¶46} Edwards' first assignment of error is without merit.

**Joinder of Offenses**

{¶47} In his second assignment of error, Edwards contends the trial court erred by denying his motion for severance because the cumulative testimony of the victims prejudiced the jury.

{¶48} "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged . . . are of the same or similar character." Crim.R. 8(A). Crim.R. 8(A) also allows for joinder of offenses that "are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." "Permitting joinder 'conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that occur in successive trials before different juries.'" *State v. Clinton*, 2017-Ohio-9423, ¶ 43, quoting *State v. Hamblin*, 37 Ohio St.3d 153, 157-158 (1988).

{¶49} "'Notwithstanding the policy in favor of joinder,' Crim.R. 14 permits a defendant to request severance of the counts in an indictment 'on the grounds that he or she is prejudiced by the joinder of multiple offenses.'" *Id.* at ¶ 44, quoting *State v. LaMar*, 2002-Ohio-2128, ¶ 49, citing Crim.R. 14 ("Relief from prejudicial joinder"). "The defendant 'has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *Id.*, quoting

Case No. 2024-T-0085

*State v. Torres*, 66 Ohio St.2d 340, 343 (1981). "But even if the equities appear to support severance, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of the joined offenses as 'other acts' under Evid.R. 404(B) or (2) the 'evidence of each crime joined at trial is simple and direct.'" *Id.*, quoting *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). "[W]hen simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *Lott* at 163.

{¶50} "To prevail on a claim that the lower court erred in denying a motion to sever, the defendant 'must affirmatively demonstrate (1) . . . his rights were prejudiced, (2) . . . at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) . . . given the information provided to the court, [the court] abused its discretion in refusing to separate the charges for trial.'" *State v. Jackson*, 2018-Ohio-3241, ¶ 22 (11th Dist.), quoting *Schaim*, 65 Ohio St.3d at 59.

{¶51} Ordinarily, appellate courts review trial court decisions regarding a Crim.R. 14 motion to sever criminal charges under the abuse of discretion standard. *State v. Ford,* 2019-Ohio-4539, ¶ 106. However, "[t]his court has held that when a defendant fails to renew a motion to sever at the conclusion of the presentation of all of the evidence at trial, as occurred here, it is waived and the matter is reviewed for plain error." *Jackson* at ¶ 22. "'Plain error exists when it can be said that but for the error, the outcome of the trial would clearly have been otherwise.'" *Id.*, quoting *State v. Issa*, 93 Ohio St.3d 49, 56 (2001).

{¶52} "'Other acts' evidence is admissible in demonstrating the identity of the perpetrator when it shows [the perpetrator] 'committed similar crimes within a period of time reasonably near to the offense on trial, and . . . a similar scheme, plan or system was utilized to commit both the offense at issue and the other crimes.'" *Id.* at ¶ 24, quoting *State v. Shedrick*, 61 Ohio St.3d 331, 337 (1991). In the present case, six victims alleged a similar "scheme, plan or system" by Edwards, and the evidence of such would have been admissible in separate trials. Edwards' pattern of behavior was to prey on and commit sexual offenses on vulnerable victims (often intoxicated and engaging in illegal behavior), while he was in uniform and on duty. The "other acts" evidence of Edwards' offenses establishes he committed the offenses under similar circumstances and followed a similar plan, and his identity. *See Jackson* at ¶ 25 (evidence of either robbery would have been admissible at separate trials under Evid.R. 404(B)(2) because it established a similar plan and the perpetrator's identity).

{¶53} The evidence was also simple and direct as to each victim. "Evidence of joined offenses is simple and direct when (1) the jury is capable of readily separating the proof required for each offense; (2) the evidence is unlikely to confuse the jurors; (3) the evidence is straightforward and easy to understand; (4) the offenses involve different victims, different incidents, and different witnesses; and (5) little danger exists that the jury would improperly consider testimony on one offense as corroborative of the other." *State v. Sharpe*, 2025-Ohio-440, ¶ 12 (4th Dist.). Further, prejudicial joinder is typically not found by appellate courts where the evidence is presented, as in the instant case, "'in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof.'" *Id.*, quoting *State v. Echols*, 2015-Ohio-5138, ¶ 16 (8th Dist.), quoting

Case No. 2024-T-0085

*State v. Lewis*, 2010-Ohio-4202, ¶ 33 (6th Dist.).  Here, the trial court also specifically instructed the jury to consider each count and the related evidence separately.

{¶54}  Further, no jury confusion is apparent from a review of the record.  The jury appeared to competently distinguish the specific offenses and specific victims, finding Edwards not guilty and guilty on various counts for offenses against M.M., K.D., C.B. and A.P., and not guilty of any offenses against L.H. (GSI) and A.R. (menacing by stalking).  "Absent evidence to the contrary, jurors are presumed to have obeyed the trial court's instructions."  *State v. Pate*, 2020-Ohio-4190, ¶ 15 (11th Dist.), citing *State v. Henderson*, 39 Ohio St.3d 24, 33 (1988).

{¶55}  Thus, we conclude the trial court did not err in denying Edwards' motion for severance since the evidence in this case would have been admissible as "other acts" evidence under Evid.R. 404(B)(2), and it was also simple and direct.  Fundamentally, Edwards failed to demonstrate any prejudice, much less any that deprived him of a fair trial and that rises to the level of plain error.

{¶56}  Edwards' second assignment of error is without merit.

**Jury Question**

{¶57}  In his third assignment of error, Edwards contends that when the jury asked "if the victim says sex was consensual and non-threatening, could it still be considered rape?" the trial court erred and abused its discretion by answering, "that issue is for your [the jury's] determination."

{¶58}  "'Where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request.'"  *State v. Williams*, 2002-Ohio-6919, ¶ 35 (11th

Case No. 2024-T-0085

Dist.)*, quoting *State v. Carter*, 72 Ohio St.3d 545 (1995), paragraph one of the syllabus; *accord State v. Kirin*, 2000 WL 1140261, *3 (11th Dist. Aug. 11, 2000). Thus, a reversal of a criminal conviction based upon a trial court's response to such a request from the jury requires a showing that the lower court abused its discretion. *Williams* at ¶ 35. Similarly, we review a motion for mistrial for an abuse of discretion. *State v. O'Neil*, 2024-Ohio-512, ¶ 48 (11th Dist.). An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2010-Ohio-1900, ¶ 62 (2d Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004).

{¶59} While Edwards contends the trial court should have instructed the jury that "if it's consensual, there is no rape," consent – and whether it is revoked – is fact specific. For instance, "[r]ape can be established when the two participants start the sexual encounter on a consensual basis, but the consent is revoked by words, actions or conduct that clearly communicates non-consent, the defendant fails to respect the change in consent, and purposely proceeds to engage in sexual conduct through force or threat of force evidenced by violence, physical restraint, or some type of coercive or threatening conduct that creates a belief or fear that physical force will be used if the victim does not consent." *State v. Hartman*, 2016-Ohio-2883, ¶ 32 (2d Dist.). In other words, "[e]vidence of consent (or lack thereof) is important to the inquiry. It is not a static concept . . . ." *State v. Freeman*, 2021-Ohio-734, ¶ 42 (2d Dist.). Nor can compliance be confused with consent. "It is a well-known rule that, while consent negatives rape, where a [person] is affected by terror or is in fear of great bodily injury and harm, brought into being by an accused, who has placed his victim within his power and control, intercourse under such circumstances without consent is rape, even though the victim might have used greater

Case No. 2024-T-0085

physical resistance or cried out, when it is shown that [the victim's] will was overcome by the fear or duress." *State v. Martin*, 77 Ohio App. 553, 554 (9th Dist. 1946) (involving an adult victim). Thus, whether there is consent is the ultimate fact determination for the jury. Were the trial court to have answered otherwise, it would have been directing the verdict.

{¶60} As such, the trial court did not abuse its discretion by telling the jury that whether an act is consensual and non-threatening is a factual determination for it alone to decide.

{¶61} Edwards' third assignment of error is without merit.

### Motion for Mistrial

{¶62} In his fourth assignment of error, Edwards contends the trial court erred by overruling his motion for a mistrial when the defense was "forced" to render its closing argument in the late afternoon and the jury showed obvious signs of fatigue and exhaustion.

{¶63} "'A mistrial should only be declared when justice so requires and a fair trial is no longer possible.'" *O'Neil*, 2024-Ohio-512, at ¶ 48 (11th Dist.), quoting *State v. Jaryga*, 2005-Ohio-352, ¶ 76 (11th Dist.). "[T]he decision whether to grant or deny a motion for a mistrial . . . rests within the sound discretion of the trial court." *Id.*, quoting *Jaryga* at ¶ 76.

{¶64} Pursuant to R.C. 2945.03, "control of trial," a trial court has the right and responsibility to control the proceedings of a criminal trial, including the length of closing arguments and in this case, the court's adjournment at the end of each day. *Jaryga* at ¶ 61, 70 (trial court did not abuse its discretion by limiting closing arguments to 30 minutes).

Case No. 2024-T-0085

{¶65} The State began its closing arguments at approximately 3:30 p.m. Defense counsel objected to continuing due to the time of day. The court overruled the objection, finding it would be "unfair to split it up." The defense began their closing arguments at approximately 4:30 p.m. Although the court allotted equal time to each side, defense counsel chose not to utilize its full amount of time. After the State's brief closing argument in rebuttal, the court read the jury the verdict forms, and the jury was taken to the jury room at 5:08 p.m. to begin its deliberations. At 5:20 p.m., the jury was excused until the following day.

{¶66} Fundamentally, no jury fatigue or exhaustion is apparent on the record, defense counsel did not object on this basis, and no juror was brought to the attention of the court for sleeping or other behavior. Thus, Edwards has failed to establish any error, much less prejudice, from defense counsel giving closing arguments in the late afternoon and not using all its allotted time despite the opportunity to do so.

{¶67} Consequently, we determine Edwards' fourth assignment of error is without merit.

**Cumulative Error**

{¶68} In his fifth assignment of error, Edwards contends that even if we determine his previous assignments of error do not rise to the level of reversible error, the cumulative effect of those errors deprived him of his right to due process, and his convictions should be reversed and a new trial ordered.

{¶69} Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the numerous instances of trial court error does not

individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). "'Before we consider whether "cumulative errors" are present, we must first find that the trial court committed multiple errors.'" *State v. Smith*, 2016-Ohio-5062, ¶ 106 (4th Dist.), quoting *State v. Harrington*, 2006-Ohio-4388, ¶ 57 (4th Dist.). The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.'" *See State v. Mammone*, 2014-Ohio-1942, ¶ 148, quoting *Garner* at 64.

{¶70} While Edwards argues he was deprived of a fair trial because of the trial court's cumulative errors, we have determined none of his individual assignments of error have merit. Thus, he "cannot establish an entitlement to relief simply by joining those claims together." *Id.* at ¶ 173.

{¶71} Edwards' fifth assignment of error is without merit.

{¶72} Finding Edwards' assignments of errors to be without merit, the judgment of the Trumbull County Court of Common Pleas is affirmed.


ROBERT J. PATTON, P.J., concurs,

SCOTT LYNCH, J., concurs with a Concurring Opinion.

_____

SCOTT LYNCH, J., concurs with a Concurring Opinion.

{¶73} I fully concur in the well-reasoned majority opinion. I write separately to offer some observations relative to the third assignment of error. As described above, the jury posed the following question during its deliberations: "if the victim says sex was consensual and non-threatening, could it still be considered rape?" The court responded:

Case No. 2024-T-0085

"That issue is for your determination." Counsel for Edwards objected: "If it's consensual, it's not rape."

{¶74} The question itself provokes a visceral reaction. As the majority rightly observes, consent is not a "static concept." Rather, it encompasses a wide variety of situations which condition the reaction. Harvey Weinstein famously asserted his belief that "all of these relationships [for which he was charged criminally] were consensual." At the other end of the spectrum, it has been argued that anything less than "enthusiastic consent" is an inadequate license for sexual conduct. McJunkin, *Rape as Indignity*, 109 Cornell L. Rev. 385, 406 (2024) ("*The New York Times* Opinion columnist Bari Weiss suggested that young feminists were 'radically redefining' consent by insisting that it must be 'affirmative, active, continuous, and--and this is the word most used--enthusiastic'").

{¶75} K.D.'s testimony that the sexual conduct with Edwards was consensual or non-threatening is not a wholly uncommon way of describing sexual assault. *See, e.g., State v. Tate*, 2024-Ohio-5319, ¶ 67 (8th Dist.) ("I consented to all of it in a way that I wasn't going to fight a man who was much taller than me and armed with a gun"); *State v. Wildman*, 2025-Ohio-2793, ¶ 28 (2d Dist.) ("C.O. testified that she was 'going along with everything' and 'let [herself] be turned around' in the shower"). With respect to such testimony, the defense objection has a certain logic: few people would object to the proposition that, when the participants consent, sexual activity is not criminal.[2] Yet that logic seems ill-suited to practical realities such as those of the present case. While consent may not need to be enthusiastic, it must mean something more than a lack of resistance. R.C. 2907.02(C) ("[a] victim need not prove physical resistance to the

---

2. Of course, certain situations such as incest and statutory rape are excepted.

Case No. 2024-T-0085

offender in prosecutions [for rape]").  It seems necessary to conclude that, in order to be valid defense to sexual assault, consent must be voluntarily given.  If consent is conceived of as an act of free-will, then true consent cannot be the product of compulsion or force.  *Compare* R.C. 5924.120(A)(3) [Code of Military Justice] ("'[c]onsent' means words or overt acts indicating a freely given agreement to the sexual conduct at issue by a competent person").

{¶76}  Despite the foregoing and the larger national debate about consent, the trial court rightly responded to the jury's question.  "In Ohio, all crimes are statutory." *State v. Cimpritz*, 158 Ohio St. 490, 492 (1953).  "The elements necessary to constitute the crime must be gathered wholly from the statute and the crime must be described within the terms of the statute." *Id.*  The role of consent in a rape prosecution, then, is fixed by statute.

{¶77}  Edwards was charged with raping K.D. in violation of R.C. 2907.02(A)(2) which provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."  Notably absent from the elements of rape is any reference to consent or the lack of consent.  "Ohio's rape statute does not require proof of the victim's lack of consent." *State v. Hartman*, 2016-Ohio-2883, ¶ 27 (2d Dist.); *Tate* at ¶ 65.  Similarly, "[t]he rape statute does not designate consent as an affirmative defense." *State v. Keeton*, 2004-Ohio-3676, ¶ 110 (5th Dist.).  Under Ohio's rape statute, then, "consent is used as a defense to challenge the State's evidence on the element of purposeful force or compulsion."

*Hartman* at ¶ 27.  Stated otherwise, a victim's consent, unless the result of purposeful compulsion, is not irreconcilable with a conviction for rape.[3]

{¶78}  Since compelled or involuntary consent does preclude a conviction for forcible rape, it is properly for the trier of fact to determine whether the purported consent was the result of force or compulsion.  Oftentimes (but not always), forced or compelled consent is what the victim is describing although her actual testimony may simply convey consent without more.  Accordingly, the formulation "[i]f it's consensual, it's not rape" is not an accurate statement of Ohio law.

{¶79}  K.D.'s testimony illustrates the foregoing.  She did describe the sexual conduct with Edwards as consensual but also believed that she was "obligated to consent."  Thus, the trial court was correct in instructing the jury that it was for them to determine whether K.D.'s consent was compelled by force or the threat of force.  Ultimately, the jury found it was not, although it did sustain the charge of sexual battery as to K.D.  R.C. 2907.03(A)(1) ("[t]he offender knowingly coerces the other person … to submit by any means that would prevent resistance by a person of ordinary resolution").

{¶80}  In sum, it is by adherence to the statutory law in Ohio that the needle is threaded between consent and rape.  Such adherence provides a way to avoid the outcomes that would be dictated where a dubious consent is claimed as a valid defense as well as where a less-than-enthusiastic consent underlies the charges.  The trial court properly left the issue with the jury to determine.

---

3. The foregoing applies to forcible rape under R.C. 2907.02(A)(2).  Under subsection (A)(1), consent and free-will underlie crime.  *See* R.C. 2907.02(A)(1)(a) ("the offender substantially impairs the other person's judgment or control"), (c) ("[t]he other person's ability to resist or consent is substantially impaired"), and (d) ("the judgment or control of the other person is substantially impaired").

Case No. 2024-T-0085

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit.  It is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.


_____
JUDGE MATT LYNCH


_____
PRESIDING JUDGE ROBERT J. PATTON,
concurs


_____
JUDGE SCOTT LYNCH,
concurs with a Concurring Opinion

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2024-T-0085