[Cite as *State v. Alejo*, 2026-Ohio-2250.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

FERNANDO ALEJO,

        Defendant-Appellant.

CASE NO. 2025-L-086

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2024 CR 000886

---

## OPINION AND JUDGMENT ENTRY

Decided: June 15, 2026
Judgment: Affirmed

---

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner* and *Adam M. Downing*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, and *Paul J. Lubonovic*, Assistant Public Defender, 100 West Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, Fernando Alejo, appeals the judgment of conviction from the Lake County Court of Common Pleas after a jury trial where he was convicted on one count of Illegal Possession of a Firearm in a Liquor Permit Premises, a third-degree felony in violation of R.C. 2923.121; one count of Murder, an unclassified felony in violation of R.C. 2903.02(A) with a three-year firearm specification; and one count of Tampering with Evidence, a third-degree felony in violation of R.C. 2921.12(A)(2) with a one-year firearm specification.

{¶2}    Appellant has raised three assignments of error arguing: (1) his conviction on Count 1, Illegal Possession of a Firearm in a Liquor Permit Premises is unconstitutional under the Second Amendment to the U.S. Constitution both facially and as applied; (2) cumulative errors in the admission of evidence and the State's presentation of the case deprived Appellant of a fair trial; and (3) his conviction for Murder was against the manifest weight of the evidence.

{¶3}    Having reviewed the record and the applicable caselaw, we find Appellant's assignments of error are without merit. First, Appellant's trial counsel was not ineffective for failing to raise a constitutional challenge to his conviction given the factual differences between his case and a recent ruling from the Fifth District Court of Appeals. Second, there were not multiple errors that undermined the fairness of his trial. Third, the evidence supported the jury's verdict despite Appellant's self-defense claim.

{¶4}    Therefore, the judgment of the Lake County Court of Common Pleas is affirmed.

**Substantive and Procedural History**

{¶5}    On October 25, 2024, Appellant was indicted by the Lake County Grand Jury on the following counts: Count 1, Illegal Possession of a Firearm in a Liquor Permit Premises, a third-degree felony in violation of R.C. 2923.121; Count 2, Murder, an unclassified felony in violation of R.C. 2903.02(A) with a three-year firearm specification pursuant to R.C. 2941.141; and Count 3, Tampering with Evidence, a third-degree felony in violation of R.C. 2921.12(A)(2) with a one-year firearm specification pursuant to R.C. 2941.141.

{¶6} Appellant pled not guilty and filed notice pursuant to Crim.R. 12.2 of his intent to raise self-defense at trial.

{¶7} Appellant also filed a motion in limine to exclude any evidence relating to other crimes, wrongs, or acts. Before trial, the State indicated that it would not introduce any evidence pursuant to Evid.R. 404(B).

{¶8} A jury trial commenced on May 5, 2025. The following facts and evidence relevant to the appeal were adduced at trial:

{¶9} Appellant and his friend I.C. had known each other for several years. Appellant was 22 years old, 5'6", and about 150 pounds. Appellant had a valid Ohio license to carry a concealed handgun. I.C. was seventeen years old, 5'7", and about 175 pounds.

{¶10} The two went to Nora's in downtown Willoughby, Ohio, on the evening of July 12, 2024, and into the morning of July 13, 2024. Nora's has a class D liquor license. Video surveillance shows both Appellant and I.C. consuming multiple beers during the night. While at Nora's, Appellant and I.C. spent time talking to and making out with women at the bar.

{¶11} Dylan Buckels saw Appellant at Nora's shortly before midnight. He said Appellant was alone when he talked to him. Buckels described Appellant as "slightly drunk. I mean, it's hard to recall completely." Buckels said that he became intoxicated and fell asleep in a nearby wooded area.

{¶12} Shortly after midnight, Juan Padilla Viruel ran into Appellant and I.C. in the bathroom of Nora's. Viruel said that both Appellant and I.C. "were drunk, you know, a little slurrish . . . on their words." He said that the two were not arguing and he did not notice

Case No. 2025-L-086

any tensions, "I talked to both of them just fine." According to Viruel, Appellant invited him to meet up at Ballantine, another local bar down the street, after leaving Nora's. Viruel said that he was with other friends and his group went to Ballantine around 12:25 a.m. He said that he heard pops that he thought were either gunshots or fireworks while walking to Ballantine. He was not concerned by the sounds because it was July and he assumed the noises were fireworks. Shortly after arriving at Ballantine, he saw police downtown, and he learned that someone had been shot.

{¶13} At 12:26 a.m. Appellant and I.C. left Nora's. Shortly after this, Jordan Dean was leaving Nora's, and he saw two people in the alleyway. One of them was standing, and the other was laying on the ground. He said he did not recognize either of the two. He offered that the person on the ground "[s]eemed to be in a defensive mechan – position." Appellant's trial counsel objected to this, and the trial court instructed the witness to "just describe what you saw." Dean continued, saying, "So I walked past. The person on the ground was in like a defensive-like position." Appellant's trial counsel again objected, and the trial court overruled the objection and asked the witness, "And you're indicating an arm over the head?" Dean responded in the affirmative. Dean said that he continued walking and then "about like thirty seconds after I passed the alley, I heard a loud bang." At the time, Dean thought the sound was a firework, and he got into his car and left. Dean also got out of the witness stand to demonstrate the position he saw I.C. in and concluded by saying, "and this is how he was in the defensive position."

{¶14} At approximately 12:30 a.m. on July 13, the Willoughby Police Department responded to a call for shots fired and a male found unconscious in an alleyway outside of a downtown bar with another male running away from the person on the ground.

{¶15} Silent surveillance video from the surrounding area showed Appellant and I.C. talking outside for several minutes near an alleyway. The two then began engaging in a struggle and grappling with each other. The camera was some distance from the two and particular details are difficult to discern. As the two were in close proximity and continuing to struggle, I.C. reels back and falls to the ground. After this, Appellant turned his back to I.C. and appeared to be stooping down on the ground in several locations. Appellant then approached I.C., who was on the ground and making movements. Appellant stood over him for a moment and I.C.'s body stopped moving. Appellant again ran away from I.C. before turning around. Appellant then bent down over I.C.'s body for a moment. After this, Appellant fled the scene across a parking lot. Surveillance video from several nearby cameras picked up the sound of two gunshots 32 seconds apart, but the videos do not cover the scene of the incident.

{¶16} An off-duty police officer, Sean Kergan, was at Nora's and had stepped outside to his car. While there, he heard a gunshot. He said a second shot came about 30 seconds later. He was able to identify the location of the shots as the alleyway next to Nora's and saw a man running away from the scene. Kergan saw I.C. on the ground and found him unconscious and not breathing.

{¶17} Heather Wagner was in her apartment and heard a gunshot. After hearing the second gunshot, she looked out of the window and saw a Hispanic male in a white T-shirt and a plaid overshirt running. She saw that he had a handgun that he put in his front waistband as he climbed over a guardrail and then walked through her apartment parking lot. After police arrived at the scene, Wagner came forward as a witness and described what she saw.

Case No. 2025-L-086

{¶18} Patrolman Fred Brown of the Willoughby Police Department responded to the scene and found I.C. unresponsive and covered in blood on his arms, chest, and head. Officers recovered two 9-millimeter cartridge casings located close to I.C.'s body.

{¶19} Around 1:30 a.m. Buckels engaged in a text exchange with Appellant but did so believing he was texting a woman he had met that night. At 1:34 a.m., Appellant responded that he had "[l]eft out of town moms [sic] called." Buckels invited Appellant to meet him for a party at 1:58 a.m. Appellant replied, "I don't know be alot [sic] of cops out at this time." Buckels said he was in Mentor, Ohio, and said "hmu, you local?" Appellant responded, "Nah." At 2:05 a.m. Appellant texted Buckels: "F****** traffic."

{¶20} Between 5:00 and 7:00 a.m., I.C.'s cousin repeatedly called and texted Appellant to ask where I.C. was and Appellant did not answer the phone or respond to the messages.

{¶21} In the hours after the shooting, investigators were able to identify Appellant as the shooter and obtain his address and phone number. Investigators began receiving tracking information on Appellant's cellphone around 9:30 a.m. and the coordinates indicated the cellphone was near South Bend, Indiana, on the Indiana Turnpike and moving west.

{¶22} Investigators contacted the Indiana State Police and provided identifying information for the Toyota Sienna they believed Appellant was driving. The Indiana Highway Patrol arrested Appellant at approximately 10:30 a.m. Trooper Paul Arnold of the Indiana State Police read Appellant his Miranda rights and questioned him briefly at the time of his arrest. Appellant said that he had no reason to believe any Ohio agency would be looking for him and denied having any issues with anybody.

Case No. 2025-L-086

{¶23} Indiana State Police searched Appellant's vehicle and found a pair of black boots with red stains on the sole of the left boot, an ammo canister with loose rounds, and two gaming systems. Later testing confirmed the presence of I.C.'s blood on the boot. Appellant also had two cellphones on his person. One of them was broken, but both belonged to Appellant. The Indiana Highway Patrol did not recover a firearm. Appellant said he did not know where the gun was.

{¶24} Investigators also searched Appellant's apartment in Painseville, Ohio. Officers found spent 9-millimeter bullet casings, boxes of ammunition, two loaded magazines, and an empty cardboard box with a serial number to an FN firearm. Officers did not find any firearms. Officers also noted a dust outline where a gaming system had been set up.

{¶25} The Painseville Police Department used traffic cameras to track Appellant's vehicle. At 1:19 a.m. on July 13, 2024, video surveillance showed Appellant's vehicle travel to the North St. Clair Street Bridge over the Grand River. The vehicle stopped on the bridge, and the driver got out of the vehicle. The driver went to the railing of the bridge and then returned to his vehicle. The driver did a U-turn on the bridge and left. On July 20, 2024, a recovery dive team located a firearm in the Grand River matching the serial number of the FN 9-millimeter handgun Appellant owned.

{¶26} Dr. Thomas Gilson of the Cuyahoga Medical Examiner's Office said that I.C. had suffered two gunshot wounds, one to the chest and one to his head. He could not medically determine which shot occurred first. In reference to the chest wound, Dr. Gilson observed burns and soot at the wound and concluded that the barrel of the gun was not more than a couple of inches away when it was discharged. The bullet damaged

Case No. 2025-L-086

ribs and the right lung. He said that I.C.'s lung would have immediately begun filling with blood. In reference to the head wound, Dr. Gilson said the gun was approximately a foot and a half to two feet away when discharged. The bullet traveled from the right ear, through the skull and brain, and came out behind the left ear without fully exiting the body. He also said that the positioning of the entrance wound indicated the barrel of the gun was "off to the right behind the person and it would be slightly above relative to where it enters the body." He said that each shot had lethal potential and that the gunshot to the skull would immediately incapacitate I.C.

{¶27} Appellant objected to the admission of an autopsy photo depicting I.C.'s open skull with a marking device used to show the travel of the bullet through his skull and brain. Appellant wanted to keep the photo out because of its gruesome nature. The trial court overruled the objection and said that the photo, although gruesome, depicting the travel of the bullet was admissible.

{¶28} Dr. Gilson also conducted blood toxicology tests on I.C. and said that his blood tested positive for cannabinoids and a blood alcohol content of .182.

{¶29} Appellant testified in his case-in-chief. He said that he lived in Illinois as a child but moved to Painesville in middle school. He said that he never graduated high school because he dropped out in order to provide for his now six-year-old son. He described various labor, agricultural, and factory jobs. He said that he moved around the country for work, had worked in Illinois for a year to help out his mother, and had he eventually moved back to Painseville.

{¶30} He admitted that he bought the gun used in the shooting and said that he had a valid concealed-carry license at the time the shooting took place.

{¶31} He said that he met I.C. at a friend's gathering and the two got along well. I.C. was 14 when they met and Appellant was 18.

{¶32} Appellant said that he had a temporary license to drive and an identification card. Although he had used both to help I.C. get into bars, Appellant said that I.C. was often able to enter bars without using identification. Appellant also admitted that he did not have a valid driver's license.

{¶33} On the date of the shooting, Appellant and I.C. worked together for a roofing company. As they were working, Appellant testified that I.C. asked him if he planned on being in a relationship with I.C.'s cousin. Appellant told him he did not know. I.C. then asked Appellant if he had sex with his cousin, and Appellant said, "Yes." Appellant said that I.C. became upset about this and ignored him.

{¶34} After work, Appellant went to his apartment, and I.C. went to his cousin's house. Later, the two decided to go to Nora's. When Appellant picked I.C. up, he felt I.C. was acting "very strange" as though he was already drunk.

{¶35} When they parked, I.C. put his glasses case in the glove compartment, noticed Appellant's firearm, "and asked if he could hold onto it so he could take a picture with it and I told him no and I told him just to leave it alone." Appellant said I.C. was "frustrated because I told him no." Appellant then grabbed his firearm and put it inside of his waistband. He said he did this to prevent I.C. from messing with the weapon. After he did this, Appellant said that I.C. came back to the car and stood "awkwardly" by the glove compartment.

{¶36} When they walked downtown, Appellant noticed that I.C. was "nodding off," and Appellant asked how much he had had to drink. I.C. told him not to worry about it. He

asked I.C. if he wanted to get some food to help sober up, but this angered I.C., and he walked off. Appellant then entered Nora's alone.

{¶37}  Shortly after this, I.C. called Appellant and said he had lost his wallet. The two retraced their steps to find it, and Appellant entered Nora's through the front, while I.C. came in the back by the patio. Once inside the bar, Appellant encouraged I.C. to talk to a girl at the bar. A little later, Appellant noticed that I.C. was acting foolish and already "pretty drunk," so he told I.C. he should stop drinking and that the two should go home. Appellant said I.C. got mad about this and walked off. He said he found I.C. in the bathroom and saw Viruel. Appellant told Viruel that he was "probably going to go to Ballantine or go home next."

{¶38}  Appellant said that I.C. lost his wallet again and asked for the keys to the van to check. Appellant told him his wallet was not there and that "if you're going back for the gun, you're not going to find it, that I -- that I have it with me."

{¶39}  Appellant admitted that he had been drinking at Nora's but denied being intoxicated, saying "I had like three in my hand, but I only really drunk [sic] like the equivalent of a couple." On the other hand, he said that I.C. was becoming belligerent and kept repeating that "my decision was my decision and that he warned me." Appellant told I.C. it was time to go home.  He said that I.C. took off "and I followed him because he had my car keys . . . ." Appellant said that he followed I.C. out of Nora's and into an alley.

{¶40}  Once in the alley, Appellant said that I.C. began threatening him. I.C. then took his glasses and jacket off and threatened Appellant "that he was going to take my gun and kill me with it." He said that I.C. then "jumped on me and attacked me." During

Case No. 2025-L-086

the ensuing fight, Appellant said that I.C. reached "for my gun" and was "throwing punches and I'm trying to push him away."

{¶41} Appellant said that when I.C. reached for his gun "it was a struggle over the gun." He tried to block him from getting it and said, "I grabbed it and then . . . when I was able to grab it before he did, but he put his hand over mine. . . . [W]e were struggling over the gun . . . . I was trying to keep it away and he kept going for it." Appellant said, "I realized he was not going to stop and he was going to keep going for it and that's when I had let off the first shot because I felt like I was going to die."

{¶42} Appellant said he did not even know if the shot hit I.C. "I just really pulled the trigger. And after that I was very disoriented and it was -- it was -- my heart was pounding and it was just chaos." He described I.C. falling to the ground, saying that "it seemed like he kind of just tripped on himself and then when I seen [sic] him fall, fall in the other direction, that's when I started looking for my car keys." He said he had tunnel vision and his heart was pounding.

{¶43} Appellant looked over at I.C. and remembered he had the keys,

[a]nd I wanted to go check on him, part of me did want to go check on him to see if he was even injured, but I seen that he was still trying to make the attempt to get back up. And I was more scared to death than anything, so I was hesitant, so I slowly walked over there to go check on him. And when I go, as soon as I get close to him, that's when he start [sic] pushing up off the ground and he lunges himself towards my gun and he reaches for it. And that's when I let off the second shot and then I ran scared. I let off -- I let off the second shot because I thought the whole thing was happening -- the whole attack was happening all over again.

{¶44} Appellant felt scared and ran off, but remembered that I.C. still had his keys, so he went to retrieve them from his pocket and then "ran off again."

{¶45}   Appellant detailed two recent incidents that were fresh in his mind while I.C. attacked him in the alley.

{¶46}   First, Appellant said that I.C. had been unusually interested in his gun in the weeks leading up to the shooting. He said that he found while I.C. was at Appellant's apartment, he was "messing around with my firearm. And when I went to grab it from him, he kind of grabbed it and refused to give it back." Second, Appellant said that earlier in the week of the shooting, I.C. "attacked me at home, but it wasn't as serious as this one. The attack started because I had mentioned to him that I took out [his cousin] that week . . . and that she looked nice and that I was planning to take her somewhere better next time."

{¶47}   Appellant said that he left the scene "because I was scared and I was still in shock over what just happened. When something like that takes place, you feel like someone is still coming after you even maybe if they're not." He said that he did not call the police and instead went home. After that, he went to his sister's house because he was scared and emotional and did not want to be alone. He said he "was not thinking clearly at all." He did not go into her house and instead sat in the driveway where he cried and had a panic attack. He said he took off his clothes because he was hot and it was hard to breathe. When he got back into the car, he saw the gun, and it reminded him of what had happened, so he drove and threw it into a river. He later drove back to the bridge because he felt "like it wasn't right that I had thrown the gun inside of the river" but he could not recover the gun.

{¶48}   He said that he went back to his sister's place and stayed outside where he tried to sleep. He started getting calls from I.C.'s family, and this reminded him of "the

Case No. 2025-L-086

whole situation that had just happened and I got emotional. I just started driving." He said he wanted to go see his mother, who lives in Illinois, to feel safe with her.

{¶49} On cross-examination, the State questioned Appellant extensively about his job history, his hourly wages, his expenses, and his monthly savings. Trial counsel objected as to relevance, but the trial court allowed the testimony. Appellant said that he would send the mother of his son about $400.00 a month. The State also engaged in a lengthy series of questions about how often he saw his son. Trial counsel again objected, and the trial court overruled the objection. At a sidebar, the State explained that the line of questioning went to Appellant's credibility because he testified that he was involved in his son's life and that the State had information to suggest this was not true. Appellant said that he had been seeing his son every other weekend, but when pressed about the truthfulness of these statements, he prevaricated and said, "I did see him around Easter and I do have proof of that --"

{¶50} The State also questioned Appellant about the gaming systems found in his car when he was arrested. He also acknowledged that he had jewelry with him, which he described as "family heirlooms." The State asked Appellant if he had left behind anything of value or important to him in his apartment. He said that he left a lot there but could not specifically recall any individual items. He said the reason he could not recall was because it had happened over a year before he testified.

{¶51} In addition, Appellant tried to minimize the number of times he had gone out for drinks with I.C., but the State impeached him with text messages indicating that he had gone out with I.C. more frequently.

{¶52} The State asked several questions about Appellant's driver's license and remarked that Appellant was "driving your car, you didn't have a license, and so you're kind of representing something that's not really true, right, which is that you have a valid license, because you don't?" Trial counsel objected to this question and the trial court overruled the objection.

{¶53} The State also questioned why Appellant would bring his gun with him to drink while I.C.'s recent actions were fresh in his mind instead of leaving the gun locked in the car. Appellant said that he brought the gun with him so I.C. "wouldn't mess with it." He said that he did not use a holster and kept the gun in his waistband. He said that he learned in his CCW class that you can go to a bar with a firearm "as long as you do not drink."

{¶54} The State asked Appellant why he had his valuables with him and suggested that he was not planning on coming back to Ohio. He denied this and said he just wanted to visit his mother.

{¶55} He admitted it was not true when he told the trooper that he was on his way to get a valid driver's license, that no one in Ohio was looking for him, and that he did not know where the gun was. He said he was still emotional and was not ready to talk about it. He also acknowledged that he failed to explain what happened and how he received certain injuries to his knees when he was admitted to the jail. He said he received the injuries from roofing rather than from the scuffle with I.C.

{¶56} He said that before he fired the second shot, I.C. was "rocking back and forth . . . and attempting to get up."

{¶57} The trial gave the jury a self-defense instruction.

Case No. 2025-L-086

{¶58} During closing arguments, the State emphasized that after Appellant shot I.C., he turned his back on him to look for his keys on the ground.

{¶59} In rebuttal, the State emphasized Appellant's credibility by saying that he had lied about being there for his son and saying he only went out with I.C. a couple of times. The State summarized Appellant's inconsistent statements by saying: "And so what I would put forward to all of you is that he is not credible. Simply put, you can't believe what he says." Trial counsel objected repeatedly during this portion of the State's closing argument.

{¶60} The State also emphasized its position that Appellant intended to flee and never come back based on his taking his gaming systems and heirloom family jewelry and his driving to Illinois. The State said that although Appellant claimed he always traveled with his gaming system so his sister's kids could play on it when he visited, the search of his apartment indicated a dust outline where the system had been.

{¶61} The jury found Appellant guilty on all counts.

{¶62} On June 13, 2025, the trial court sentenced Appellant to 36 months in prison on Count 1; an indefinite, mandatory minimum term of 15 years to a maximum of life in prison on Count 2 with a mandatory three-year firearm specification to be served prior to and consecutively to the minimum term; and 36 months in prison on Count 3 with a mandatory one-year firearm specification to be served prior to and consecutively to the sentence.

{¶63} Appellant timely appealed raising three assignments of error.

Case No. 2025-L-086

**Assignments of Error and Analysis**

{¶64} Appellant's first assignment of error states: "[APPELLANT] RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN [APPELLANT] WAS CONVICTED ON COUNT 1 BECAUSE HE FAILED TO MOVE TO DISMISS IT AS UNCONSTITU[T]IONAL. (Dkt. 11 122, 135, 150)"

{¶65} In reviewing an ineffective assistance of counsel claim, the standard we apply is "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *State v. Story*, 2007-Ohio-4959, ¶ 49 (11th Dist.), quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984). An appellant must demonstrate (1) counsel was deficient in some aspect of representation, and (2) there is a reasonable probability, were it not for counsel's errors, the result of the proceedings would have been different. *Strickland* at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. A failure to "satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 2000-Ohio-448, ¶ 49.

{¶66} An appellant "'must show that the attorney made errors so serious that he or she was not functioning as "counsel" as guaranteed by the Sixth Amendment, and . . . that he or she was prejudiced by the deficient performance.'" *Story* at ¶ 49, quoting *State v. Batich*, 2007-Ohio-2305, ¶ 42 (11th Dist.). Ohio courts presume that every properly licensed attorney is competent, and therefore a defendant bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from

Case No. 2025-L-086

counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 1995-Ohio-171, ¶ 40. "'Failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial.'" *State v. Henderson*, 2007-Ohio-2372, ¶ 42 (8th Dist.), quoting *State v. Shannon*, 1982 WL 5057, *2 (9th Dist. June 16, 1982).

{¶67} Appellant's argument under this assignment of error asserts that his trial counsel was ineffective for failing to challenge the constitutionality of R.C. 2923.121 and move for dismissal of Count 1 of the indictment. He cites *State v. Striblin*, 2024-Ohio-2142 (5th Dist.), *appeal accepted*, 2024-Ohio-4713, where the Fifth District held that insofar as R.C. 2923.121, which prohibits the possession of a firearm in any room where any person is consuming beer or intoxicating liquor in which a class D permit has been issued, was not consistent with the historical tradition of firearm regulation and thus violated the Second Amendment to the United States Constitution. *Id.* at ¶ 36-38; *see District of Columbia v. Heller*, 554 U.S. 570 (2008); *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022).

{¶68} Appellant notes that *Striblin* was released before his trial began and that his trial counsel was ineffective for not making a motion to dismiss this count.

{¶69} R.C. 2923.121 provides in pertinent part:

(A) No person shall possess a firearm in any room in which any person is consuming beer or intoxicating liquor in a premises for which a D permit has been issued under Chapter 4303. of the Revised Code or in an open air arena for which a permit of that nature has been issued.

**(B)(1) This section does not apply to any of the following**:
. . .

Case No. 2025-L-086

**(e) Any person who has been issued a concealed handgun license that is valid at the time in question** or any person who is an active duty member of the armed forces of the United States and is carrying a valid military identification card and documentation of successful completion of firearms training that meets or exceeds the training requirements described in division (G)(1) of section 2923.125 of the Revised Code, **as long as the person is not consuming beer or intoxicating liquor or under the influence of alcohol or a drug of abuse**.

(Bold added.)

{¶70} Division (A) of the statute prohibits anyone from possessing a firearm in an establishment with a class D permit while anyone is consuming beer or liquor there. However, the statute states that there are exceptions to that prohibition. Division (B)(1)(e) simply narrows the prohibition by rendering it inapplicable to certain people, including any person with a concealed handgun license who "is not consuming beer or intoxicating liquor or under the influence of alcohol or a drug of abuse."

{¶71} Furthermore, R.C. 2923.111(B) and (C) create the legal fiction that any person who is qualified to obtain a concealed handgun license is "deemed to have been issued a valid concealed handgun license." R.C. 2923.111(C)(1)(a). However, such persons are still subject to all restrictions placed on those with a valid concealed handgun license. R.C. 2923.111(C)(1)(c).

{¶72} The two statutes taken together provide that any qualifying adult may carry a concealed handgun into a premises with a class D liquor permit. The only prohibition against doing so is that said person not consume beer or intoxicating liquor or be under the influence of alcohol or a drug of abuse while carrying the concealed handgun in a premises with a class D permit.

{¶73} *Striblin* engaged in a lengthy discussion of the history and tradition of American gun control regulations and concluded that the law cannot prohibit a person from carrying a concealed handgun into a premises with a class D permit. *Striblin*, 2024-Ohio-2142, ¶ 20-36 (5th Dist.).

{¶74} We are called to address whether trial counsel was ineffective for failing to raise the constitutionality of R.C. 2923.121 and seeking to have that charge dismissed based on the Fifth District's holding in *Striblin*. However, although the facts of the case suggested that Striblin had consumed alcohol while on the premises, this case is different from *Striblin*. In that case, the defendant pled no contest to the offense. *Id.* at ¶ 13-14. The Fifth District addressed whether the defendant was a "qualified adult" subject to R.C. 2923.131(B)(1), which renders "section (A) non-operational against certain classes of individuals . . . , except in the case of either intoxication or consumption of alcohol by those classes." *Id.* at ¶ 18. The Fifth District said that there "was a factual and legal dispute" about whether that exception applied. *Id.* The court noted that no facts relating to the exceptions in R.C. 2923.121(B) "were contained in the indictment" and the State was not arguing that the defendant was intoxicated. *Id.* at ¶ 18. Therefore, the court concluded that "[a]lthough it seems an argument could be made that because of this language the State bears the burden to allege and then prove either fact, no such argument was made." *Id*. Despite this factual uncertainty, the Fifth District said that the defendant had "preserve[d] his argument that the Second Amendment prohibits the government from criminalizing *his conduct* of *carrying* a gun into a Class D liquor establishment." (Emphasis added.) *Id.* at ¶ 19.

{¶75} In short, the only statute at issue in *Striblin* was R.C. 2923.121(A)—the blanket prohibition on carrying in a place with a class D permit. That, and not the much narrower prohibition created by R.C. 2923.121(B), was at issue in *Striblin*. This difference is critical. In this case, it is not in question that Appellant had a concealed handgun permit. Thus, his conduct inside Nora's must be analyzed under R.C. 2923.121(B). We are not aware of any Ohio court holding that provision unconstitutional. Inasmuch as *Striblin* had no precedential value to the case before us, it was not ineffective for trial counsel to assess the facts of this particular case and not seek to advance a meritless argument or advocate for a change of law when there was no factual basis to do so. *See State v. Harden*, 2022-Ohio-1436, ¶ 59 (4th Dist.).

{¶76} Accordingly, Appellant's first assignment of error is without merit.

{¶77} Appellant's second assignment or error states: "DUE TO CUMULATIVE ERRORS IN THE ADMISSION OF EVIDENCE AND PRESENTATION OF ARGUMENTS [APPELLANT] WAS DEPRIVED OF A FAIR TRIAL."

{¶78} Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 1995-Ohio-168, ¶ 62. Before considering whether cumulative errors have undermined the fairness of a trial, we must first find that the trial was subject to multiple errors. *State v. Edwards*, 2025-Ohio-5708, ¶ 69 (11th Dist.), *appeal not accepted*, 2026-Ohio-1308. The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.'" *State v. Mammone*, 2014-Ohio-1942, ¶ 148, quoting *Garner* at 64.

Case No. 2025-L-086

{¶79} Appellant asserts several errors occurred during his trial and argues that the cumulative effect of these errors deprived him of a fair trial. We address each issue in turn:

**Inadmissible evidence under Evid.R. 404(B):**

{¶80} Evid.R. 404(B)(1) provides: "Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." "This type of evidence is commonly referred to as 'propensity evidence' because its purpose is to demonstrate that the accused has a propensity or proclivity to commit the crime in question." *State v. Hartman*, 2020-Ohio-4440, ¶ 21.

{¶81} Evid.R. 404(B)(2) provides:

Permitted uses; notice

This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. The proponent of evidence to be offered under this rule shall:

> (a) Provide reasonable notice of any such evidence the proponent intends to introduce at trial so that an opposing party may have a fair opportunity to meet it;

> (b) Articulate in the notice the permitted purpose for which the proponent intends to offer the evidence, and the reasoning that supports the purpose; and

> (c) Do so in writing in advance of trial, or in any form during trial if the court, for good cause excuses lack of pretrial notice.

{¶82} First, Appellant argues that the trial court should have excluded the State's extensive discussion of his personal possessions, including his gaming systems, his expensive boots, cash, and heirloom jewelry, which were all found in his car. He says that

the State inappropriately used these items to argue that Appellant intended to flee and not return to Ohio, thus undercutting his self-defense argument. He also says that even if the evidence was indicative of flight, the evidence was more prejudicial than probative.

{¶83} We disagree. The evidence that Appellant had these personal belongings with him was not Evid.R. 404(B) propensity evidence. Appellant's gaming consoles, shoes, cash, and jewelry did simply were not "evidence of any other crime, wrong, or act," and therefore it was not improper for the State to introduce these items into evidence for the purpose of demonstrating Appellant's consciousness of guilt and attempt to flee.

{¶84} Second, Appellant argues that the trial court erred by permitting the State to introduce evidence regarding Appellant's lack of a driver's license. He asserts that this was done to demonstrate his propensity for law-breaking. The State argues that it introduced this evidence was not admitted for the purpose of showing Appellant had a propensity for law-breaking but rather was necessary to show that Appellant was being dishonest with the Indiana State Police when he was arrested. When Appellant was arrested, he said that he was on his way to get his license when he was pulled over. Appellant admitted that this was not true on cross-examination. Appellant's lack of a valid license was not introduced or used for the purpose of demonstrating his propensity for law-breaking. Instead, it was relevant to establish Appellant's intent when he fled the State of Ohio and to attack his credibility in his explanation for doing so.

**Prosecutorial misconduct:**

{¶85} In a claim of prosecutorial misconduct, whether based on improper remarks or other conduct, we consider (1) whether the State's remarks or conduct were improper, and if so, (2) whether they prejudicially affected the appellant's substantial rights. *State v.*

Case No. 2025-L-086

*Treesh*, 2001-Ohio-4, ¶ 22. The allegedly improper statements or conduct are evaluated in the context of the entire trial. *Id*. Improprieties do "not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without" them. *Id*.

{¶86} Prosecutors and defense counsel are afforded a wide degree of latitude during closing arguments to address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Kelly*, 2012-Ohio-523, ¶ 63 (11th Dist.). "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Smith*, 2000-Ohio-450, ¶ 87, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶87} The Supreme Court of Ohio has held that "[i]t is improper for an attorney to express his personal belief or opinion as to the credibility of a witness . . . ." *Smith*, 14 Ohio St.3d at 14. Further, "the [S]tate may not '*unfairly* suggest[ ] that the defense's case was untruthful and not honestly presented.'" (Emphasis added.) *State v. Thompson*, 2014-Ohio-4751, ¶ 194, quoting *State v. LaMar*, 2002-Ohio-2128, ¶ 167. Prosecutors are permitted to make fair comments on the testimony and evidence. *See State v. Mundt*, 2007-Ohio-4836, ¶ 119 (finding the prosecutor's characterization of a rape as "brutal" was fair given the evidence). Likewise, "[a] prosecutor may not express his personal opinion about the guilt of the accused, unless he bases that opinion on the evidence presented in court." *State v. Keenan*, 66 Ohio St.3d 402, 408 (1993).

{¶88} Appellant argues that the prosecutor engaged in misconduct while questioning Appellant on cross-examination and during closing argument. Appellant's arguments relate to the State's questioning of Appellant about how often he visits his son and what he does with his money. However, the line of questioning about the frequency of Appellant's visits with his son and his job history was something that Appellant testified to during his direct examination, and it was fair for the State to question him to illustrate possible inconsistencies in his testimony and therefore undermine his credibility.

{¶89} In addition, Appellant argues that the State inappropriately commented on Appellant's credibility during closing arguments saying, "[a]nd so what I would put forward to all of you is that he is not credible. Simply put you can't believe what he says."

{¶90} We agree with Appellant. It was improper for the prosecutor to offer a personal opinion about Appellant's credibility. However, we do not find that this comment prejudicially affected Appellant's substantial rights. We cannot say that it is clear beyond a reasonable doubt that but for this comment during closing argument that the jury would have otherwise found Appellant to be credible and would have otherwise believed his self-defense claim.

**Inadmissible and prejudicial evidence:**

{¶91} Finally, Appellant argues that the trial court erred by allowing "technically relevant" but "inadmissible and unfairly prejudicial and inflammatory" evidence to be admitted. He identifies two such instances.

{¶92} First, Appellant says that Dean's lay opinion testimony about I.C. being in a "defensive position" was highly prejudicial. He says that Dean was not qualified as an expert on fighting stances or self-defense and thus violated Evid.R. 701 because the

testimony was not "(1) rationally based on the perception of the witness and  (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶93}  Dean testified that he only briefly viewed I.C. on the ground as he walked past and acknowledged that he did not know if I.C. was moving or not. He also said that he was unsure if the two were fighting or drunk. In this context, Dean demonstrated what he meant by I.C. being in a "defensive position" for the jury by getting on the ground and re-enacting what he was describing.

{¶94}  In doing so, Dean's testimony made clear what he meant by I.C. being in a "defensive position" and helped the jury obtain a clear understanding of the witness' testimony. Dean's lack of specialized knowledge, his brief observation, and his uncertainty were all well-established, and the jury was free to give whatever weight it chose to Dean's description of I.C.'s position on the ground as he walked past.

{¶95}  Second, Appellant argues that the trial court erred in admitting the photograph of the interior of I.C.'s skull because the gruesome nature of the photograph made the evidence more prejudicial than probative.

{¶96}  Evid.R. 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶97}  The evidence was more probative than prejudicial. Although the photograph was indeed gruesome, it depicted the travel of the bullet through I.C.'s skull and brain. The marking device helped to show why Dr. Gilson concluded that the bullet had entered I.C.'s body from "off to the right behind the person . . . slightly above relative to where it

Case No. 2025-L-086

enters the body." The entry position of the bullet from behind is highly probative and worth demonstrating through a single photograph, despite the gruesome nature of the image.

{¶98} Because we have not found multiple errors, the cumulative error doctrine does not apply.

{¶99} Accordingly, Appellant's second assignment of error is without merit.

{¶100} Appellants third assignment of error states: "THE JURY'S VERDICT ON COUNT 2, MURDER, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDNCE. (Dkt, 122, 135)"

{¶101} When evaluating the weight of the evidence, we review whether the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other indicated clearly that the party having the burden of proof was entitled to a verdict in its favor, if, on weighing the evidence in their minds, the greater amount of credible evidence sustained the issue which is to be established before them. "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis deleted.) *State v. Thompkins*, 1997-Ohio-52, ¶ 24. Whereas sufficiency relates to the evidence's adequacy, weight of the evidence relates the evidence's persuasiveness. *Id.* at ¶ 37 (Cook, J. concurring).

{¶102} The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 2021-Ohio-4258, ¶ 22 (11th Dist.); *State v. Antill*, 176 Ohio St. 61, 67 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, his or her interest, if any, in the outcome of the case, and his or her connection with the prosecution or the defendant. *Landingham* at ¶ 22. This Court,

engaging in the limited weighing of the evidence introduced at trial, is deferential to the weight and factual findings made by the factfinder. *State v. Brown*, 2003-Ohio-7183, ¶ 52 (11th Dist.). The reviewing court "determines whether . . . the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶103} A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 2013-Ohio-1842, ¶ 32 (11th Dist.).

{¶104} In order to convict Appellant of Murder, the State was required to prove beyond a reasonable doubt that he "purposely cause[d] the death of another." R.C. 2903.02(A). Appellant requested and received a self-defense instruction. R.C. 2901.05(B)(1) provides in relevant part:

> If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶105} "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *State v. Messenger*, 2022-Ohio-4562, ¶ 25. "[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden." *Id.* Where, as here, the

Case No. 2025-L-086

defendant satisfies this burden of production, the prosecution must satisfy the "burden of disproving the defendant's self-defense claim beyond a reasonable doubt," i.e., the burden "of persuading the jury beyond a reasonable doubt that [the defendant] was not acting in self-defense" in the use of force against another. *Id.* at ¶ 27, 26.

{¶106} The elements of a self-defense claim are:

> "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger."

*Id.* at ¶ 14, quoting *State v. Barnes*, 2002-Ohio-68, ¶ 11.

{¶107} In this case, Appellant was lawfully present in a public place and therefore had no duty to retreat. Retreat cannot be considered as a factor in determining whether his used force was necessary. R.C. 2901.09.

{¶108} "The state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial to sustain its burden." *State v. Hardman*, 2024-Ohio-300, ¶ 23 (5th Dist.); *State v. Knowlton*, 2023-Ohio-3759, ¶ 18 (11th Dist.).

{¶109} The first element of self-defense, that the defendant was not at fault in creating the situation giving rise to the affray, "means that the defendant must not have been the first aggressor in the incident." *State v. Turner*, 2007-Ohio-1346, ¶ 23 (2d Dist.); *State v. Robbins*, 58 Ohio St.2d 74, 80 (1979).

{¶110} In this case, the video of the incident does not make clear whether Appellant or I.C. initiated the affray. Appellant testified at length about I.C.'s drunken and belligerent behavior throughout the evening and stated that I.C. attacked him in the alley outside of Nora's. That being said, Appellant's testimony was self-serving and his credibility was

severely undercut by his subsequent actions including fleeing the scene, failing to notify the police or obtain medical attention for I.C., throwing the weapon into the Grand River, and driving to Illinois, among other actions.

{¶111} The second element of self-defense, whether a person has a bona fide belief of being in imminent danger of death or great bodily harm, is "a combined subjective and objective test." *State v. Thomas*, 1997-Ohio-269, ¶ 29. "[T]he jury first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, [he] *reasonably* believed [he] was in imminent danger." *Id.* "Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an *honest* belief that [he] was in imminent danger." *Id.* "'Although the term "great bodily harm" is not statutorily defined, Ohio courts of appeal have concluded that the term is substantially similar to "serious physical harm," which is statutorily defined.'" *State v. Daniel*, 2024-Ohio-5551, ¶ 40 (11th Dist.), quoting *State v. Chavez*, 2020-Ohio-426, ¶ 69 (3d Dist.); *see* R.C. 2901.01(A)(5).

{¶112} Appellant testified that I.C. had been unusually interested in his handgun and that he had asked about it earlier in the evening. He also said that I.C. was drunk and acting foolishly. Appellant said that I.C. attacked him and threatened to grab his gun and kill him. The video surveillance of the incident shows the two struggling back and forth. The coroner testified that the shot to I.C.'s chest was at extremely close range and that the gun may have been pressed against I.C. This is consistent with the video evidence of a struggle and with Appellant's testimony that I.C. was grabbing at Appellant's gun.

Case No. 2025-L-086

{¶113} However, after the first shot, Appellant turned his back on I.C. and began looking for his keys on the ground. I.C. was lying on the ground facing a wall in the alley. I.C. was moving but did not get up. Appellant reapproached him and stood over him. The second shot to I.C.'s head entered from slightly behind. According to the coroner, the shot to the head was fired from a distance of approximately a foot and a half to two feet away, would have immediately incapacitated I.C., and would have a fatal result. The video surveillance shows that Appellant fired this second shot, ran away briefly, and turned around again to retrieve something from I.C.'s body. Appellant then fled the scene.

{¶114} Appellant did not call the police or seek medical attention for I.C. As noted above, he took numerous actions to escape and hide or destroy evidence, and he left the State. Once he was arrested, he made several statements disclaiming any knowledge about why law enforcement would be looking for him.

{¶115} While there was evidence to support Appellant's belief of being in danger of imminent danger of death or great bodily harm, there was significant evidence to the contrary. Indeed, the evidence that Appellant was in danger of death or great bodily harm after he had fired the first shot is virtually non-existent. Although Appellant claimed he felt fear as he approached I.C. and said that I.C. "lunged" at him, the video evidence does not support this claim.

{¶116} Appellant's credibility was at issue. We cannot say that the jury lost its way in resolving that question in finding Appellant guilty. It is certainly not an exceptional case warranting reversal.

{¶117} Accordingly, Appellant's third assignment of error is without merit.

Case No. 2025-L-086

{¶118} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


MATT LYNCH, P.J.,

ROBERT J. PATTON, J.,

concur.

## JUDGMENT ENTRY

For the reasons stated in the opinion of this court, Appellant's assignments of error are without merit. It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

Costs to be taxed against Appellant.

_____
JUDGE JOHN J. EKLUND

_____
PRESIDING JUDGE MATT LYNCH,
concurs

_____
JUDGE ROBERT J. PATTON,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-L-086